## E. D. MITCHELL V. THE STATE.

### No. 1580. Decided June 16, 1897.

**1. Murder—Evidence—Clothing of Deceased.**

On a trial for murder, it is competent for the State to have the clothing worn by deceased at the time he was shot to be exhibited by a witness to the jury, and for said witness to testify in reference thereto. Following Hart v. State, 15 Texas Crim. App., 202.

**2. Same—Antecedent Acts and Declarations—Res Gestae.**

On a trial for murder which grew out of a difficulty between two factions, it was competent, and was part of the res gestae, going to show why deceased and defendant were present at the time and place of the killing, to prove that a short time prior thereto a member of one of the parties came to a livery stable kept by a member of the other faction and challenged one of the opposite party to come up street and have a fight.

**3. Same—Acts and Conduct of Third Parties—Harmless Error.**

It can not be seen how defendant could possibly have been injured by permitting a witness to testify that he might have heard of defendant's brother having had some trouble.

**4. Examination of Witness—Explanation of the Expressions or Terms Used By.**

Where a witness had testified that defendant and his brothers had "good grit," it was not error to refuse to permit defendant to prove what the witness meant by the expression, since it was one which was well understood in common parlance.

**5. Nonexpert Evidence—Gunshot Wounds.**

Where a witness is shown not to be an expert in the knowledge of gunshot wounds, it is not error to reject his testimony as to the appearance of such wounds.

**6. Impeachment of Witness—Contradictory Statements—Hearsay and Collateral Matters.**

A witness can not be impeached by proof of contradictory statements as to matters which are hearsay and purely collateral.

**7. Impeachment of Witness by Showing His Prejudice—Predicate For.**

In order to entitle a defendant to impeach a witness by proof of certain collateral matters which might tend to show the witness' prejudice against defendant, a predicate should first be laid by asking the witness himself as to his prejudice; and, if he denied it, then call his attention to the particular collateral matter supposed to manifest such prejudice, thereby giving him an opportunity for explanation. It is incompetent to prove such collateral matter by independent testimony where a proper predicate, as above indicated, has not been laid.

**8. Murder—Manslaughter—Self-defense—Charge of Court.**

On a trial for murder, where the testimony shows that defendant was one of the original conspirators, or that he entered into the difficulty going on between the other parties wilfully and wrongfully, and engaged in the same with deadly weapons, knowing that he or his adversary might be killed, Held, a killing by him could not be less than murder in the second degree. If he did not engage in the difficulty wilfully or or wrongfully, but, being present and seeing two parties assault his friend, and believing his friend to be in danger of life or serious bodily harm, he shot at one of the parties, when deceased turned upon him in the attitude of firing, or being from defendant's standpoint apparently about to fire upon him, defendant's right of self-defense would be unimpaired. Held, further, that upon the facts, as above stated, where the court in the charge gave defendant an absolute right of self-defense, and there being nothing in the evidence showing conditions stated that would produce adequate cause, the court did not err in refusing to submit the issue of manslaughter.

**9. Murder—Evidence—Charge—Mutual Combat.**

See facts stated in the opinion, which, on a trial for murder, fully authorized the court to submit to the jury the law of mutual combat.

**10. Same—Imperfect Self-defense.**

On a trial for murder, where it is apparent that defendant engaged in the combat with felonious intent, with a deadly weapon, and under circumstances indicating that persons on the one side or the other might be killed, the law of imperfect self-defense predicated upon mutual combat did not arise.

**11. Same—Defense of Another—Charge.**

On a trial for murder, where, from defendant's own testimony, it appeared that he fired upon deceased solely to prevent deceased from killing him, it was not error for the court to fail to charge upon his right to kill if deceased was attempting to take the life of his friend, and especially so where, if deceased was making such attack upon the friend of defendant, defendant did not see it.

**12. Same—Self-defense—Appearances—Serious Bodily Injury—Charge.**

On a trial for murder, where the evidence showed, that if deceased made an assalut upon defendant it was with no less intention than to take defendant's life, it was not error for the court to so limit the right of self-defense and omit to charge upon self-defense based upon appearances of serious bodily injury.

**13. Same—Actual and Apparent Necessity.**

On a trial for murder, where the evidence shows, if anything, an actual and not an apparent danger, and the court instructed the jury to regard the circumstances from defendant's standpoint; and furthermore, that the doctrine of self-defense is limited to necessity or apparent necessity, this was sufficient.

**14. Motion for New Trial—Newly Discovered Evidence.**

A motion for new trial for newly discovered evidence is properly refused where such evidence would not probably alter the result upon another trial.

APPEAL from the District Court of Hunt. Tried below before Hon. HOWARD TEMPLETON.

Appeal from a conviction for murder in the second degree; penalty, five years imprisonment in the penitentiary.

On the 6th day of July, 1895, the grand jury in the District Court of Hunt County presented an indictment against appellant, in which it was charged that on or about the 2d day of July, 1895, he did, in Hunt County, Texas, kill and murder Charley Green, by shooting him with a pistol.

The following statement of the facts of the case is taken from appellant's brief, and is substantially correct:

The testimony for the State and for the appellant both agree in establishing: That Mitchell & Bishop, a firm composed of Bob Mitchell and J. E. Bishop, were conducting a livery business at Celeste, Texas, the point where the Missouri, Kansas & Texas and Gulf, Colorado & Santa Fe Railways cross. That when they went into business they bought the stable of one ———— England, a brother of Arthur England, who agreed not to go into business again. That soon after they had bought the business, Arthur England established a livery business at said town, and continued the same until November, 1894, at which time he sold out to Green & Thomas, a firm composed of Riley Green and Bud Thomas, and said Arthur England continued to work for them at times. That deceased, Charley Green, was a brother of the said Riley Green, and conducted a livery stable at Kingston, about three miles from Celeste, on the Missouri, Kansas & Texas Railway. That appellant was a brother of the said Bob Mitchell, and worked for M. K. Harrell & Bro., general mer-

chants, at Celeste, and had been so working for a number of years. That prior to the time Green & Thomas bought the England stable the Greens and Mitchells had been friendly, and had known each other for some ten or twelve years. That after the purchase of said stable by Green & Thomas trouble came up between the two stables about the livery business, and especially about the transfer business from one depot to the other, and from the depots to the hotels. That John Kennedy, the first witness who testified for the State, conducted the Santa Fe Hotel at Celeste, and J. C. Short conducted the Lindell Hotel at the same place. That the Green & Thomas stable worked in the interest of the Santa Fe Hotel, and the Santa Fe Hotel in their interest, and the Mitchell & Bishop stable took their business when they could to the Lindell Hotel, and the Lindell Hotel recommended them. That for some time prior to the date at which Charley Green was shot, the hands working for the two stables had been very aggressive, and sometimes quarrelsome, over the baggage at the railway trains. That appellant had never had any connection with, and had never been present at, any of these difficulties. That on the morning of the difficulty, Riley Green telegraphed deceased to come to Celeste from Kingston, and he came on horseback, riding in a lope most of the way. That Riley Green admitted on cross-examination that he had told deceased about the trouble, and that he was going to whip Bob Mitchell, and deceased said that was what he would do, and asked Riley to let him know so that he could be there and see it. That after sending said telegram, deceased came, and when he rode into the stable, an hour after the telegram was sent, his horse was muddy, and he said, "Good morning; how is tricks?" From this point there is some conflict in the testimony.

Following is the testimony for the State:

The State proved by Riley Green that after deceased had come to his stable, Claude Yeager, who was an employe of Mitchell & Bishop, came to the stable of witness and told Henley, an employe of witness, to get his friends and come up on the street, and they would fight it out. Yeager then went to Harrell's store and got defendant, and to the stable and got Bishop, and that Henley, witness, deceased, and Arthur McNatt went up to what is called Short's corner, on the main street of the town. That after they had got there, there was talk of Yeager and Henley fighting, and that appellant said to witness, "I heard you wanted to whip Bob." Witness answered he did, and appellant said, "Bob is sick; I will take his place." Witness replied he had nothing against appellant, and appellant replied that if he, witness, was itching for a fight, he could take Bob's place. Witness retorted that he had nothing against appellant, but if it was an accommodation to him, witness would fight. That then friends stepped in and stopped them. Witness and appellant both said they had nothing against each other, and were willing to drop it, and appellant laughed and said he was not mad, and then turned away, and witness did the same. That then Bishop came up and said he had a settlement to make with witness. That he understood that witness said he

was the man that whipped his negro. Witness denied saying it, and Bishop called Bob Nelson to prove that he said that Bishop was in the gang that whipped the negro. Witness then admitted this. Then Bishop said that any man that said he had anything to do with that was a lying son of a ———; and witness said to Bishop, "Don't say that; you will say too much." Then Bishop repeated that any man that said he had anything to do with it was a lying son of a bitch. Then Bud Thomas struck Bishop and knocked him to his knees. Bishop put his hand in his pocket. Thomas struck him again, and knocked him down, and witness pressed on after Bishop, and when Bishop fired a shot, witness grabbed the pistol. That after he got the pistol, Bishop fired another shot. This witness was corroborated, as to Yeager's coming and challenging Henley to fight, by the State's witness, R. D. Cross, and as to the talk between appellant and said Riley Green, and the fight between Bishop and Thomas, and by John Kennedy, witness for the State, as to the talk between appellant and Riley Green and the fight between Bishop and Thomas; and by Walter Lewis as to the same facts.

The State proved by the witness, John Kennedy, that after Bishop had been knocked down by Thomas, and while Thomas and Riley Green had Bishop down on the ground, and they were on top of him, that appellant shot twice at Bud Thomas and Riley Green. That appellant at this time was about sixteen feet from deceased, and deceased was nearest to the men on the ground, and had his back towards appellant. That after appellant shot the last time in the direction of the men on the ground, that he turned his hand a little, and shot three times in the direction of deceased and witness. That witness could see the bullets hit deceased, and knock the dust out of his coat. When the first shot struck deceased, he began to turn, when appellant shot him again, and deceased ran his hand in his bosom and drew a pistol, and then appellant ran. Deceased pursued him about ten feet before he got his pistol entirely out of his scabbard. That when he got it out, he commenced shooting at defendant, and shot at him three times, and then came back to the drugstore, and sat down, and was taken in the house. This witness was corroborated as to the shooting by defendant and deceased, by the State's witness R. D. Cross, and by the witness Walter Lewis, and by the witness Andy Henderson, and by witness W. B. Schmidt. This last witness added that at the time deceased was first shot, he was standing with his arms crossed and his left hand on his mustache, looking at the men on the ground.

The State proved by John P. Pierce, that he was informed there was going to be a row in town. That he went to Riley Green, and told him they were about to get into a row. That he heard that he, Riley, had called Bob Mitchell certain names, and that witness would like for him to take it back, and Riley said he would, and told witness to go and tell Bob Mitchell so. He went to hunt Bob and could not find him. He found appellant and talked to him; told him what Riley Green had said. Appellant seemed to get irritated; said he did not want to get into a row with them at all, but if he went into it, he was going in to kill, but

before witness left he promised not to bring up any trouble. That if any trouble came up, somebody else would have to bring it up. That appellant did not know whether Green had said what was reported or not, but witness told him that he had, but had taken it back. On cross-examination this witness said that what he had heard was that Riley Green had said that Bob Mitchell was a son of a bitch, and he was going to whip him. Witness denied having told anyone that Tom Norman of Hunt County had asked him to get appellant discharged from Harrell's store after the killing, and said that it was the Tom Norman of Collin County who had told witness that, but admitted that he himself had advised Harrell & Bro. that it was best for defendant to quit their employ for a while.

The State proved by Riley Green that Arthur England got deceased's pistol immediately after deceased was taken into the drugstore, and just after the shooting, and that there were two shots left in the pistol. That it was a black-handled, blue-barreled, 38-caliber pistol, and he exhibited the pistol to the jury with two shots and three empty cartridges in it. In this he was corroborated by Arthur England.

Following is the testimony for appellant:

Riley Green's declarations and acts previous to the difficulty: Appellant proved by Bob Nelson that about a month before the difficulty Riley Green met witness and said they had been having a little fun since he had been away. That he had been gone two or three days, and they had whipped his negro, and that he could whip the sons of bitches that did it, and he believed that Bishop and Mitchell were both in it. This witness was working for Mitchell & Bishop at the livery stable. The same afternoon, witness heard that Riley Green accused him of being in it, and meeting Riley, asked if he did. Riley said he did not, but what he said about Bishop and Mitchell he meant, and the quicker they knew it, the better.

By J. M. Pruitt: That he was constable of the precinct in which Celeste was situated. The day before the difficulty he went first to Mitchell & Bishop's stable, and saw Bob Mitchell and Mr. Bishop, and told them they ought to stop the trouble. They told witness they did not want any trouble; that they had done everything they could to keep from having any. Then witness went to the Green & Thomas stable, saw Riley Green, and told him the same thing. He answered: "There is no grit over there at that stable." Witness then replied, "You will be the worst fooled ever you were in the world. You will find as good grit there as is in the county." Riley replied, "That is good advice, but it will take a fight to settle it, and the sooner it comes off the better it will be." Riley Green admitted that on the morning of the difficulty, about 8 o'clock, he sent a telegram to deceased to come and see him whip Bob Mitchell.

By Eli Moore: That on the morning of and prior to the difficulty, Riley told him that he and Bob Mitchell had to have a fight that day.

Bud Thomas's acts and declarations prior to difficulty: Appellant proved by Melvin Davis that a day or two before the difficulty Thomas told witness he was expecting trouble between the two stables, and if they had it while he was gone, he was going to make them have it over. Said he was in a hurry to get back, because he was looking for it. This conversation was about three and one-half miles from Celeste.

On cross-examination of State's witness J. F. Kennedy: That at Kennedy's Hotel, on the morning of the difficulty, prior to the time that deceased came to Celeste, Thomas told witness that he expected trouble would come up that morning.

John Henley's acts and declarations prior to the difficulty: Appellant proved by J. M. McWilliams, that two or three days before the difficulty Henley tried to borrow a pistol from witness; said his pistol would not go off every time he called on it, and he wanted one to kill rats with.

By John Gibbs: That two or three weeks before the difficulty he had a conversation with Henley in front of Green & Thomas's stable, it being the first time that witness had seen Henley at the stable. Witness said, "What are you doing there?" Henley replied, "I am here giving the Mitchell gang all the dirt I can, and there is going to be hell there some day. We are going to whip them." When witness started off Henley tried to borrow a pistol from him.

By Andrew Nelson: That the night before the difficulty he was at the Green stable talking with John Henley, and that Henley said the crowd at the Mitchell & Bishop stables were all damned sons of bitches, and would not fight, except John Kennedy and Bob Nelson. That he wanted witness to tell them what he said. Witness agreed to do so, and that night told Claude Yeager, one of the employes of the Mitchell & Bishop stable, what Henley had said.

Charley Greene's acts and declarations prior to difficulty: Appellant proved by Mat Bickerstaff, that about three weeks before the difficulty he was with deceased at Cleburne, trading horses, when deceased told him that appellant was a dad-burned coward, and he would not take a snap of his fingers for him.

By John Powell: That on the day before the difficulty witness came from Kingston to Greenville with deceased, and deceased talked about the difference between the two livery stables at Celeste, and said he expected a general row some day, and he told Riley to wire him when it did come up, and he would get there in a half hour, and if he was not in town, to just save him a man, and he would get him when he came in, and that Eb Mitchell (appellant) was the man he wanted.

By C. L. Lingle: That he was telegraph operator at Kingston, on the Missouri, Kansas & Texas Railway. That on the morning of the difficulty he received a message from Riley Green to deceased, and handed it to him. That this was about 8:30.

By Mel Orms: That after deceased received the telegram he said he was going to Celeste. This witness worked for deceased.

By James Hodges: That on the morning of the difficulty he saw deceased saddling his horse, and deceased said he was going to Celeste. Deceased seemed to be in a hurry.

By William Scott: That he lived in Kingston, and that deceased had agreed to go to Greenville on the day of the difficulty, but went to Celeste. Witness saw deceased leaving town in a fast trot or lope.

By John Clark: That he lived about a mile from Kingston, on the road to Celeste. On the day of the killing he saw deceased pass his house riding in a lope. That the road was muddy.

By I. N. Porter: That he lived about half a mile from the witness John Clark, and between him and Celeste. That on the morning of the difficulty he saw deceased pass his house going in a lope toward Celeste.

By Riley Green, on cross-examination: That about an hour after the telegram was sent deceased rode into his stable at Celeste, his horse being muddy, and said, "Good morning! How is tricks?"

Appellant proved by Claude Yeager that early in the morning of the difficulty witness was at Harrell's store, collecting some expense bills, and as he came out he saw Bob Mitchell and John Henley talking. Bob said, "I heard you called me a son of a bitch." Henley said he did not say it. Bob said, "That is all right. You must not ever call me that." Henley went on down the street, and witness followed him, and told Henley that he understood that he (Henley) had called him a son of a bitch, and he cursed Henley. Henley said he did not say it. About this time appellant came up and took hold of witness's arm, and told him to go on off and let Henley alone.

By Charley Patterson: That he heard the quarrel between Yeager and Henley early in the morning, and saw appellant come up to them, and heard him say, "Claude, you have said enough to Mr. Henley. You go on and attend to your business."

J. M. Hoard, State's witness, testified to seeing this difficulty, and said appellant appeared to be the peacemaker.

From the time that deceased reached the Green & Thomas stable at Celeste on the morning of the difficulty, he and Riley Green, Bud Thomas, John Henley, Arthur McNatt, Arthur England, and others of their friends, and employes of the stable, acted together in the pursuit of the difficulty, and appellant proved by State's witness Riley Green, on cross-examination, that when deceased came he talked to deceased about the coming fight in the presence of the other parties, but could not remember what deceased said. That after deceased came they all went to the train, and he (witness) went there to whip Bob Mitchell. On getting there he heard that Bob was sick, and as they came back they all laughed about how easy it was for a man to get sick at such a time. That then the whole crowd went to see the fight between Yeager and Henley, and witness and deceased both said they hoped Henley would whip him. That before the difficulty occurred deceased asked witness if he had a

pistol scabbard, and said he had none himself. Witness gave him one. Deceased put his pistol in it, saying it was unhandy to carry a pistol without a scabbard. Thomas remarked to deceased, when he was putting the pistol on, "that if he ever needed it, he could not get it." Deceased replied, "that he would not need it, but if he did, he could get it." Thomas showed him that he ought to carry his pistol in his hip pocket, and showed his (Thomas's) pistol, which was swung in a shoulder scab-

By John McCune, witness for defendant: That on the day before the difficulty two ladies traveling complained to him about the hack drivers fussing over their baggage. That on the morning of the difficulty, being a friend to both parties, he went to the Green & Thomas stable and talked to Riley Green, and told him something ought to be done about it. Riley said, "it was a shame to do that way, but it was too late then to talk about it; that he had to go to the depot, and if Mitchell's outfit was there they would settle it." This talk was in the back of the stable, and they went to the front, where Thomas, Henley, deceased, McNatt, and England were standing. Witness said, "Boys, I would not go down there to make any racket." Thomas replied, "It is too damned late to talk about it now. Come, get in; let's go." Riley said, "Mac is right about this, but it is too late to talk about it." Deceased said, "Come on boys, let's go. We will settle this when we get to the depot," and they got in the wagon and drove off. Then witness went to Mitchell & Bishop's stable, and Bob Mitchell was sick, and he talked to Bishop. Bishop said he had heard about the ladies, and was sorry, and that he would see if he could not arrange things better.

By Andy Nelson: That he was at the Green & Thomas stable on the morning of the difficulty, when deceased came there. That deceased, Riley Green, Bud Thomas, and others went to the back end of the stable and talked awhile; then they walked to the front, and deceased walked out on the porch in front and said, " I am watching for the trouble to come up. If Eb (meaning appellant) makes a crack, I will go at him."

.By Dr. Sarvis, State witness, on cross-examination: That he was at the Green & Thomas stable, and talked to Riley Green and Thomas. They said the thing had to come off that morning, and that they were fixing for it. They had some guns out, and were rubbing them up, or getting them in shape somehow. That witness saw Bud Thomas with one. Witness understood from what they said that Riley Green was going for Bob Mitchell, and Bud Thomas for Mr. Bishop. Witness went to the depot to see the fight, but it did not come up there.

By Ed Adams, witness for defendant: That he was at the depot on the morning of the difficulty and talked to Riley Green, trying to get him reconciled. That Riley said his mind was made up to whip Bob Mitchell. Witness told him that not only he but his friends would be involved, and they might get hurt or killed, and he would regret it. Riley said, "I know you are giving me good advice, but I have made up

my mind to whip Bob Mitchell, and I intended to whip him this morning, but I understand he is sick."

By Charley Hismith: That he was at the depot that morning, and learned from a man named Moore that the crowd from the other stable were going to clean up the crowd from the Mitchell & Bishop stable. (This witness was an employe of Mitchell & Bishop.) Witness went to Riley Green and told him what he heard. Riley said, "Yes, he was; that he was going to whip Bob Mitchell." Witness told him Bob was sick at the barn. Riley replied, "Bob had better stay sick." Witness then asked Mr. Ed Adams, the last preceding witness, to talk to Riley and see if he could not get it settled without a difficulty.

By Barney Fields: That on the morning of the difficulty he was at Green's stable, and heard a conversation between Riley Green and Doc Young. Young had a small stick in his hand, and Riley said if he had a stick at the train that morning he could use it to good advantage in a fight. Young replied, if it was necessary, he could have one there. Riley advised him to do so. Young said the one he had was not large enough, but he could get a larger one. Witness was at the depot, and saw Young there, with a good sized stick. When they returned to the stable, Young remarked that the stick sure went to the train. Riley laughed and said yes. This witness worked for Green & Thomas.

By John Kennedy: Appellant proved that he was at the depot to meet the train on the day of the difficulty. That he was working at that time for the Bishop and Mitchell stable. That while at the train Riley asked witness where Bob Mitchell was. Witness replied, "Sick in bed at the barn." Riley said he had better stay sick; that he had been run over as long as he was going to; he was going to whip Bob Mitchell or Bob would whip him. Witness told him he had better let things alone. Deceased then came up and asked witness the same question that Riley had asked. Deceased said "the fight was coming off that morning, and he was fixed in case it did come off." As he said this he put his hand towards the waistband of his pants.

All the testimony showed that deceased, Riley Green, Bud Thomas, John Henley, Arthur McNatt, Doc Young, and Arthur England, and maybe one or two other parties, went to the depot together that morning to meet the train. Appellant proved by Claude Yeager, that after both crews returned from the train he had some bills to collect, and went into Barnard's store, which is about four doors from the Green & Thomas stable. That when he came out John Henley was waiting for him, and came up and said, "Claude, I have a settlement to make with you, and this is a good time to have it." Witness told him that since he denied what he had accused him of, that the trouble was over. Henley replied that the witness had to fight. By that time the hands from the Green stable had surrounded witness, and Henley and Riley Green were insisting on a fight. They went up the street some distance, and witness said he would get some of his friends, and started off, and went to Harrell's store to find Charley Hismith. Defendant was in there, and asked wit-

ness what was the matter. Witness replied, "Nothing," and went out. On the way to the stable he met Hismith, and asked him to go up and see that he (witness) had a fair fight. At the stable he saw Bishop, Bob Nelson, and John McCune, and told them what had happened, and that he was going to fight Henley. They tried to keep him from it, but he told them he could not help it. He changed his boots for shoes, and went back up to the Short corner.

By Gavin Roach: That he was at the Green & Thomas stable after the parties returned from the train, and saw John Henley come up in his wagon, and Riley Green asked him if he had seen Claude Yeager. Henley told him no. Riley told him "to go and see Yeager; that this thing had to come off." Deceased, Bud Thomas, Arthur McNatt, and others were present. Henley replied, "All right, I will go," and he went up the street to Barnard's store, which is two or three doors above the stable. Yeager walked out, and they talked a little, and he and Henley walked up the street to where the difficulty occurred, and the crowd at the stable followed.

By Lis Gibbs: That he heard and saw the same things as stated by Gavin Roach, and heard Riley call after Henley as he went up to where Yeager was, "Tell them we will take it any way they want it."

By Eb Neal: That on the morning of the difficulty, and just before it commenced, he saw John Henley come up to Claude Yeager in front of Barnard's store and say something to him, and they went up the street and the crowd followed them.

By Fred Aldridge: That he saw John Henley walk up to Claude Yeager in front of Barnard's store and tell Yeager that he was going to settle that fight they had that morning. Yeager asked him to walk up the street, and he walked up to the stable and came back to the Short corner.

By John McCune: That while he was at the Mitchell & Bishop stable, talking to Bishop, on the morning of the difficulty, and after the parties had been to the train, Claude Yeager came in the stable and asked for his shoes, and seemed excited, and said that John Henley had called him out to fight, and he could not honorably get out of it. He was afraid to fight Henley, but he had to do it. Witness and Bishop tried to keep Yeager from fighting Henley, but he would go, and they followed him up to the Short corner, where a large crowd had gathered.

The same facts were testified to by J. E. Bishop and Bob Nelson.

By Dr. Harry Roberts, witness for State, on cross-examination: That on the morning of the difficulty, while the crowd was gathering, he saw Bud Thomas passing his door, and called him in and advised him not to have any trouble. Thomas said he had taken abuse until he was tired, and if it came up, he was going to let it come.

By Dr. J. F. Harris: That on the morning of the difficulty he was called at attend Bob Mitchell, who was sick at the livery stable, with cramp colic. That he was subject to spells of that kind, and witness treated him. Witness saw appellant at the livery stable that morning,

and had a conversation with him, and heard him talking to Bob, his brother, in which he said, "Bob, I was going to Merit to-day, to the Masonic school there, but you are so sick, I will not leave you." It was just an hour to train time. I told him to go and get ready, and if his brother was easy by that time for him to leave, he could go. He said, "All right, I will get ready, but if you don't get easy, Bob, I will not leave you," and then went off.

Appellant himself testified, that he saw the trouble between Claude Yeager and John Henley early in the morning of the difficulty, and he went to them and stopped it, and told Claude to go about his business. That his brother Bob had been complaining that morning of having cramp colic. That he went down to the stable to see him. Dr. Harris was with him, and he had gotten a little easier when appellant got there. Appellant told him that he had intended to go to Merit that day, but as he, Bob, was sick, he would not go. The doctor told appellant to get ready; that he thought Bob would be easy by train time. On the way to the store to get ready, Charley Hismith told him (appellant) about Riley Green being mad about something with Bob, and that he was going to whip Bob when he met him. Appellant told Charley he guessed it did not amount to anything. He went to the postoffice and got his mail, went up to the store, and fixed to go to Merit. He got the money he was going to take with him, and was ready to start out, when Claude Yeager came in, seeming to be in a great hurry. Appellant called to him and asked what was the matter, and he answered something, but appellant did not understand what it was, and Yeager went out. Appellant thought perhaps his brother was worse, and followed Yeager out, and saw the crowd at the Short corner, and went up to the crowd. In fixing to go to Merit appellant had put on his pistol, because he was going from Merit to Dallas, and wanted it with him.

After the parties were gathered at the Short corner, the testimony offered in behalf of appellant showed that appellant came up and asked what was the mattter. Somebody replied that Yeager and Henley were going to fight. Yeager and Henley then stepped out a little distance from the sidewalk and fronted each other, when Yeager said, "You are an awful big man for me to fight." Then appellant stepped down off the walk and went up to them and said, "Henley, you are too big to fight Claude. You boys must settle this without a fight." Other parties said substantially the same thing. Then Riley Green stepped off the sidewalk and said, "Eb, it is not your fight, and you have nothing to do with it." (The witnesses stated this variously, some of them saying that Green said, "You have no chips in this game.") Appellant replied, "I know that, but John is too big to fight Claude," to which Riley said, "What did three of you jump on John for this morning, when he was up there by himself?" Then appellant explained to Riley what had occurred that morning. Then Riley braced himself up and looked at appellant, and said "he believed a fight would help them, any way." Appellant replied," I understand you wanted to whip Bob; he is sick this morning,

but if you are bound to have a settlement, I am here in his place." Riley said, "Eb, I haven't a thing in the world against you." Appellant replied, "I haven't a thing in the world against you." Then Riley said, looking at appellant, "But if you want to take Bob's place in this, you can do so." Appellant told him he had not come there for a fuss, but that he (Riley) could jump on appellant if he wanted to. About this time deceased stepped up and said, "I will fight Yeager; I am about the size for him." Appellant replied that he was not hunting any fight. Other parties were still interfering and saying that there ought not to be any fight. Appellant then raised his hand, and said there was nothing the matter with him; he did not want any trouble. Then the difficulty seemed to quiet down, at which time Riley Green stepped up to Mr. Bishop and said, "Boys, it looks like we could get a scrap out of this crowd. I think a fight would do us all good." Bishop replied that there had been too much said already. Riley wanted to know what had been said. Bishop said that he understood that Riley had said that he and Bob Mitchell were the sons of bitches that whipped his negroes. Riley denied saying it, and Bishop replied that it was all right if he did not say it. Then Riley asked Bishop who told him. Bishop replied, "Bob Nelson, and there he stands." Riley called on Bob Nelson. Bob Nelson said that Riley had said he believed Bob Mitchell and Bishop were the sons of bitches that whipped his negroes. Riley said that he did say that. Then Bishop said, "Any man that said that he whipped the negroes or had anything to do with it was a liar and a —;" to which Riley Green said, "Look out, old man; don't go too far; I will break your neck." Bishop repeated that whoever said it was a liar and a son of a bitch, at which time Bud Thomas struck Bishop and knocked him around, and struck him again in the back or side of the neck and knocked him down, and he and Riley Green both jumped on him. About the time Bishop struck the ground, his (Bishop's) pistol fired; the crowd then scattered some. Bud Thomas continued to strike and beat Bishop, and Riley Green had hold of Bishop's hands, and some of the witnesses said was striking him. Just as the second shot from Bishop's pistol fired, appellant testifies that he did not know who fired it, but that he caught sight of Bishop for the first time, and saw his head fall back, and his face was all bloody, and he thought that he was shot, and he pulled his pistol and shot at Bud Thomas twice, and then paused for a moment with his pistol in the same position, and saw deceased turning on him with his pistol in his hand, and thereupon appellant directed his next shot at deceased, and as deceased got nearly around deceased fired, and about the same time appellant fired his second shot at deceased, and tried to shoot the third time, but his pistol missed fire. Then appellant ran towards the store. Appellant's witnesses say that just before appellant shot at Bud Thomas deceased shot twice at Bishop, the balls striking the ground close to Bishop's head, Bishop being at that time on the ground with Bud Thomas and Riley Green both on him. That immediately after deceased's second shot appellant fired two shots at Bud Thomas, and then

deceased turned upon appellant, and appellant seeing him turning with his pistol in his hand, fired two shots at deceased in quick succession. That about the time of appellant's last shot deceased fired his first shot at appellant. That after appellant fired his second shot at deceased he snapped his pistol and then ran towards the store, deceased pursuing him and shooting three shots at him as he ran along the sidewalk. Then deceased turned and sat down in a chair in front of the drugstore, from which he was removed into the drugstore. These witnesses, as usual, differ as to the position of the parties at the time of the shooting, and vary some as to whether deceased or appellant first shot at the men on the ground, but all their testimony is substantially as stated above, except some of them did not see the beginning of the difficulty, and some did not see the ending of it. Appellant also proved by the witness Bascom Bates that after deceased had fired at the men on the ground, and after defendant shot twice at the men on the ground, that witness heard another shot a little south of deceased, which was not fired by appellant.

Appellant proved by M. K. Harrell, A. L. Puckett, B. D. Ewing, and a number of others, that they knew his general reputation in the community where he lived for being a peaceable, law-abiding citizen, and that it was good.

Appellant proved by Dr. J. E. Cannon and Dr. J. G. Norris that they examined Charley Green after he was shot, and that in their opinion he was struck by three balls, one in front near the seventh rib and one in the back near the ninth rib, and near the spinal column, and one in the left shoulder, and that none of the balls ever came out.

Appellant proved by J. A. Friddle that he saw deceased's pistol immediately after the shooting, and that the chambers were all empty. And proved the same facts by P. A. Short.

The State in rebuttal proved also its theory of the shooting by several witnesses, and proved by the doctors who examined the wounds, that one entered the left shoulder from the side and did not some out, and one entered from the back near the spinal column and came out in front.

*R. L. Porter, M. M. Brooks,* and *Perkins, Gilbert & Perkins,* for appellant.—The court erred in permitting the witness Riley Green to exhibit the coat, vest, and shirt worn by the deceased at the time he was shot, to the jury, and testify in reference thereto, because the same could not be made a part of the record. Nothing should be admitted to influence the jury in their verdict that can not be brought before the court of last resort, who must pass upon the sufficiency of the evidence.

The court erred in permitting the witness Riley Green to testify that Claude Yeager came down to his stable, or near his stable, the morning of the difficulty, and challenged John Henley to come up the street and have a fight, because the same was hearsay. Nothing that is not res gestae, and did not occur in the presence of the party on trial, is admissible unless it is shown that it was done with his knowledge or con-

sent. Washington's Case, 17 Texas Crim. App., 203; Johnson's Case, 22 Texas Crim. App., 207.

The court erred in refusing to permit the appellant, on re-cross-examination, to prove by the witness J. M. Pruitt what he meant by saying in his cross-examination that Bob Mitchell and J. E. Bishop had as good grit as any men in the country, because where an expression is used that is not definite in meaning, it is admissible to explain the same. Any technical term or provincialism, or local expression used by a witness, is always susceptible of explanation. The witness, on cross-examination by the State, used the expression that the parties referred to had good grit. Appellant's counsel asked on re-direct examination what he meant by that, expecting him to answer that they were not cowards, and would fight if imposed on. Abbott's Trial Ev., p. 484.

The court erred in refusing to permit appellant to prove by A. Lacy that the appearance of the wounds on Charley Green's body indicated that each one of the three wounds was the place of entrance of the balls, and neither of them was the place of exit. A matter that can be learned by common observation of ordinary men is susceptible of proof by such men, and such testimony is not confined to the medical profession. Jackson's Case, 29 Texas Crim. App., 462; Powers's Case, 23 Texas Crim. App., 42.

The court erred in refusing to permit the defendant to prove by Tom Norman, of Hunt County, that he had never told John Pierce that M. K. Harrell & Bro. should discharge the defendant, and erred in refusing to permit appellant to prove by the same witness that said Pierce told him that it was Tom Norman of Pike, Collin County, who had made that statement to him (Pierce). Any testimony showing that the witness was biased or prejudiced against the party is admissible as a matter of impeachment, though otherwise is would be on an immaterial and collateral issue. Surrell's Case, 29 Texas Crim. App., 325.

The court errred in refusing to permit the appellant to prove by the witness M. K. Harrell that the State's witness John Pierce tried to get said Harrell to discharge appellant from his employment after the shooting of Charley Green by appellant.

The court erred in the general charge to the jury in failing to charge on the law of manslaughter, because the evidence raised that issue. Any condition or circumstance, which is capable of creating sudden passion, sufficient to render the mind incapable of cool reflection, may constitute adequate cause so as to reduce homicide to manslaughter, and when the evidence shows a number of conditions or circumstances occurring at the time of, or incident to, the killing, tending either singly or collectively to constitute what a jury might consider adequate cause, it is the duty of the court to submit that issue, and leave the jury to determine from all the evidence whether or not adequate cause existed. Meuly's Case, 26 Texas Crim. App., 306; Howard's Case, 23 Texas Crim. App., 266; Ellison's Case, 10 Texas Crim. App., 362; Richardson's Case, 28 Texas Crim. App., 216.

The court erred in charging upon the law of mutual combat, because the evidence did not raise that issue. Where the evidence does not present the theory of mutual combat, it is error to charge upon it. Rosborough's Case, 21 Texas Crim. App., 672; Polk's Case, 30 Texas Crim. App., 658; King's Case, 4 Texas Crim. App., 54; Woodring's Case, 33 Texas Crim. Rep., 26; Phipps' Case, 34 Texas Crim. Rep., 560, 608; Glover's Case, 33 Texas Crim. Rep., 227; Fowler's Case, 22 S. W. Rep., 587.

The court erred in not submitting the converse of the proposition, that if the appellant voluntarily engaged in a combat, knowing that death might result, and not telling the jury what would be the result if he engaged in it not knowing that death might result. The doctrine that one who brings on a difficulty, with intent to kill, can not avail himself of self-defense, carries with it the corrolary that if the quarrel be begun without a felonious purpose, the homicidal act will not be murder. Polk's Case, 30 Texas Crim. App., 659; Hawkins's Case, 36 S. W. Rep., 443; Wilson's Case, 36 S. W. Rep., 587.

· The court erred, in charging on the law of self-defense, in telling the jury that the homicide must have been committed for the purpose of preventing the offense of murder. When a homicide is committed, it is justifiable when, from the acts of the assailant, or his words coupled therewith, it reasonably appears that his purpose or intent is to murder, or commit some other serious bodily injury to the assailed party. Penal Code, art. 570; Kendall's Case, 8 Texas Crim. App., 569, and authorities cited in sec. 970; Willson's Crim. Stats., p. 191.

The court erred in telling the jury that to justify appellant he must have shot the deceased for the purpose of preventing deceased from killing him (appellant). If appellant shot deceased to prevent him from murdering, or inflicting serious bodily injury upon Bishop, he would be justified. Penal Code, art. 579; King's Case, 13 Texas Crim. App., 277; Guffee's Case, 8 Texas Crim. App., 187; Dyson's Case, 14 Texas Crim. App., 454; Sterling's Case, 15 Texas Crim. App., 249.

The court erred in limiting the right of self-defense to preventing the commission of the offense of murder, because appellant may have been justified in killing deceased upon the appearances of danger. It is not essential to the right of self-defense that the danger should in fact exist. If it reasonably appears from the circumstances of the case that danger existed, either to appellant or to Bishop, appellant had the same right to defend against it to the same extent that he would have were the danger real. Penal Code, arts. 570-574; Conner's Case, 23 Texas Crim. App., 378; Bell's Case, 20 Texas Crim. App., 445; authorities cited in sec. 978, Willson's Crim. Stats.

The court erred in limiting the right of self-defense to cases of necessity, and to not exceeding the bounds of mere defense and prevention. Where a person is attacked, and from such attack it appears that death or serious bodily injury may be inflicted upon him, his right of self-defense is not limited to necessity, but he may pursue the party until

the real or apparent danger is past, and this pursuit may become more than a mere defensive matter.

The court erred in refusing to give the jury special charge number 1, in which the jury were charged, substantially, that if Thomas and Riley Green had Bishop down on the ground, and defendant thought they were in the act of killing him, and the defendant, not having participated in the difficulty prior thereto, would have the right to shoot either said Thomas or Green, to prevent them from killing the said Bishop, because this was a material issue in the case. Where there is a difficulty in progress between a number of people, and one who is not a party thereto interferes to save the life of a friend, being moved by that object alone, he is justified in such interference. Where a difficulty is in progress between several, and an outsider interferes to save the life of a friend, and thereby is brought into a conflict with some person not then engaged in the difficulty, and slays such latter person, then it is the duty of the court to explain to the jury the law affecting defendant as to his original interference.

The court erred in refusing to give the jury special charge number 2, asked by appellant, which presented the theory of killing on the appearances of danger, because the evidence raised that issue. Where the evidence raises the issue as to whether or not the party on trial for homicide committed the same under the belief that he was in danger of losing his life, or having serious bodily injury inflicted upon him by the party slain, then the court should submit that issue. Bonner's Case, 29 Texas Crim. App., 225; Marnoch's Case, 7 Texas Crim. App., 269; Williams' Case, 2 Texas Crim. App., 271.

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment fixed at a term of five years in the penitentiary; hence this appeal.

Appellant assigns as error the action of the court in permitting the witness Riley Green to exhibit to the jury the coat and vest and shirt worn by the deceased at the time he was shot, and testify in reference thereto, because, he says, "the same could not be made a part of the record." This was made a part of the record. The condition of said garments was testified about before the jury. See Hart v. State, 15 Texas Crim. App., 202; Jackson v. State, 28 Texas Crim. App., 373.

Appellant complains that the court committed an error in permitting the witness Riley Green to testify that Claude Yeager came down to his stable, or near his stable, the morning of the difficulty, and challenged John Henley to come up the street, and have a fight, on the ground that this was hearsay. It appears that on the morning of the difficulty, and just prior thereto, a fight was made up between the witness Yeager and Henley, Yeager representing the Mitchell faction and Henley representing the Green faction. This was the beginning of the difficulty in

which the deceased lost his lift. It was the occasion of deceased and defendant being present at the time the homicide occurred. It was a part and parcel of the res gestae, and, in our opinion, was admissible. The cases referred to by appellant have no application.

The objection made by appellant to the testimony of Pruitt that he knew Bill Mitchell, a brother of defendant, and that he might have heard of said Bill Mitchell having had some trouble, was not well taken. The answer of this witness does not show that he knew of any trouble in which Bill Mitchell, the brother of the appellant, had ever been engaged, and we fail to see how the answer given could possibly injure appellant. Nor was there any error in refusing appellant the right to prove what the witness meant by stating that the Mitchells had "good grit." We apprehend that under the circumstances in which this word was used the jury had no difficulty in understanding its meaning, to wit, as used in the dictionaries, "to indicate firmness of mind, courage, spunk." See Webst. Dict.

The witness Lacy did not show that he was an expert in the knowledge of gunshot wounds, and there was no error in rejecting his testimony as to the appearance of the wounds on the body of the deceased.

Appellant complains that after the State had proved by John Pierce that he had not talked to Tom Norman, of Hunt County, about getting the defendant discharged from the employ of Harrell & Bro., the court erred in not permitting him to prove by said Norman that Pierce did talk to him on said subject. What may have occurred between the witness Pierce and Tom Norman about this matter, it occurs to us, was purely hearsay, unless it was intended to prove that deceased procured Tom Norman to endeavor to secure the removal of defendant from the employ of Harrell. This the bill does not undertake to show. It shows that the witness denied having a conversation with Tom Norman, of Hunt County, in regard to having Harrell & Bro. release defendant from their employment. All that was proposed to be proved in said conversation was that the witness said to Tom Norman, of Hunt County, "that Tom Norman of Collin had asked him to get defendant discharged from the employ of Harrell & Bro." It seems from the bill itself that the witness admitted that Norman of Collin County had suggested the matter to him. The only contradiction involved was whether or not the witness Pierce had ever had a conversation in regard to said matter with Tom Norman of Hunt County. It occurs to us, as presented by this bill, that the matter was hearsay, and was purely collateral.

On the trial of said case, appellant's eighth bill of exceptions shows "that he introduced N. K. Harrell as a witness, and asked him if he had ever had any talk with John Pierce in which said Pierce said anything to him about discharging defendant from the employ of N. K. Harrell & Bro., and, if so, what he said, expecting the witness to answer that after Charley Green was shot, and after defendant had surrendered, and gone to work for him again, that said John Pierce came to witness, and asked him to discharge defendant from his employ, and advised him to do so

on the ground that it would injure the business of said Harrell if defendant continued to work for him." This was excluded, and a bill of exceptions was reserved. Now, it would have been perfectly competent, in order to show that the witness John Pierce was prejudiced against appellant, that he endeavored to have his employers discharge him, but the witness Pierce should have been first asked about this matter, to afford him an opportunity of denying or explaining the same. His explanation might have been such as to have obviated the necessity of any contradictory evidence. If he had denied the same, then, as showing prejudice on his part against appellant, it would have been competent to have contradicted him upon this collateral matter. The bill fails to show that John Pierce was asked any questions in regard to this matter, or that any predicate was laid for its introduction; and it fails to show that the purpose and object of this testimony was to show prejudice on the part of Pierce. If he had been asked as to this prejudice, he might have admitted that he entertained such prejudice, and there would have been no necessity for any further investigation. If he had denied such prejudice, and this matter had been called to his attention, he might have admitted suggesting that appellant be discharged, but on such grounds as would have entirely relieved the case of any prejudice on his part. The bill as presented does not show any error on the part of the court in excluding this evidence.

Appellant contends that the court erred in its charge to the jury in failing to charge on the law of manslaughter, because the evidence raised that issue. "He insists that conditions and circumstances which are capable of creating sudden passion, and render the mind incapable of cool reflection, might constitute adequate cause so as to reduce homicide to manslaughter, and he urges that the circumstances existed in this case. He furthermore urges that the jury may have believed that the appellant wrongfully interfered in the fight that was going on between Bishop, Thomas, and Riley Green, but still may have believed that Charley Green drew his pistol on appellant before appellant fired, or made any demonstration to fire at him, and that the act of Charley Green in presenting his pistol at appellant was sufficient to arouse in the mind of appellant such terror as to render his mind incapable of cool reflection, thereby producing adequate cause for appellant to shoot said Charley Green, and still they may have held in doing so he was not justified, by reason of his wrongfully engaging in the controversy between the other parties, under which state of case the case would have been manslaughter, and not murder in the second degree." If appellant wrongfully interfered in the fight between Riley Green and Thomas on the one side and Bishop on the other, evidently he did so as an original conspirator with Bishop, Yeager, and others on the one side against the Greens and Henley and Thomas and others, on the other side. If the jury believe that he wrongfully entered into said combination, then his offense in killing deceased could not be reduced to manslaughter. If he entered into said difficulty as one of the original conspirators, and if in the progress of the

difficulty, and while he was firing at Thomas, he saw Charley Green in the act of firing at him, and he then fired at Charley Green, and killed him, it could not be less than murder in the second degree. In the light of the circumstances presented by the evidence, whenever it is conceded that defendant wrongfully engaged in the fight going on between Riley Green and Thomas on the one side and Bishop on the other, such concession apprehends that there was an understanding beforehand—that is, before Yeager and Henley engaged in their altercation (which was the occasion of the difficulty); that appellant entered into said fight willingly, and engaged in a contest with deadly weapons, in which he or his adversary might be killed. If appellant did not engage in said fight willingly, but merely happened there, without any understanding that he was to stand by his side in any anticipated difficulty, and if Riley Green and Thomas jumped on Bishop, and got him down, and Bishop was in danger of his life or of serious bodily injury to his person, or it so appeared to the defendant from his standpoint, then he did not engage in said altercation wrongfully; but, if he shot at Thomas under such circumstances, he had a right to shoot at him; and, if deceased turned upon him in the attitude of firing, or, from defendant's standpoint, apparently about to fire, defendant's right to fire upon deceased would be unimpaired. Such act on his part could not possibly be manslaughter, but would be in self-defense. The charge of the court on self-defense gave defendant the absolute right of self-defense under such conditions. We can not conceive that the court would have been justified in giving a charge on manslaughter based on appellant's wrongful interference in the fight between Bishop on the one side and Thomas and Green on the other. We think such a charge would have been erroneous. Counsel, in discussing the case, admit that if this question is looked to in the light of the testimony of the defendant, there is no manslaughter in the case, but insist that we are not circumscribed by his testimony alone, but there may be other facts in the case that would require the court to give a charge on manslaughter. There may be such cases, but in this case, however, if we look only to the testimony of the defendant, there is nothing in it that would authorize a charge on manslaughter. Looking to his evidence, the court would not have been justified in giving manslaughter, as it only raised the issue of self-defense, and, if the court had given a charge on manslaughter, he might have had just cause of complaint, because such a charge would not have been from his standpoint. If we look beyond his testimony to that of other witnesses for the defense who testified as to the difficulty between Bishop on the one side, who was appellant's friend, and Riley Green and Thomas on the other, still we fail to see how the court was required to give a charge on manslaughter. From their testimony appellant was either justified in engaging in the difficulty, and so not wrongfully entering into it, or was justified during the progress of the difficulty in shooting Charley Green. If he entered into said difficulty not justifiably, but wrongfully, and shot Charley Green in the progress thereof, at the least he would be

guilty of murder in the second degree, and not manslaughter. There is nothing in their testimony showing conditions that would produce adequate cause to engender passion sufficient to render appellant's mind incapable of cool reflection. Their testimony fails to make any adequate cause.

Appellant contends that the court committed an error in charging on mutual combat, insisting there is no testimony in the case raising the issue. On this subject the charge of the court was as follows: "The doctrine of self-defense, hereinbefore set out, applies to a defensive, and not an offensive, act, and is limited to necessity, or apparent necessity, and can not exceed the bounds of mere defense and prevention; and where a person voluntarily engages in a combat, knowing that it may or will probably result in death, or some serious bodily injury that might produce the death, of his adversary or himself, he can not claim to have acted in self-defense. Therefore, if you find that a controversy existed between Bob Mitchell and some of his friends on the one side, and Riley Green and some of his friends on the other side, and that the controversy was about to culminate in a difficulty, and if you further find that the defendant voluntarily made himself a party to the controversy and the difficulty that ensued, knowing that the difficulty would, or might probably, result in death or some serious bodily injury that might produce death of some one or more persons engaged in the difficulty, and if you further find that the defendant shot and killed Charley Green in the progress of the difficulty, then the doctrine of self-defense, hereinabove set out, would not apply, and he would not be justifiable, and this would be the case, no matter to what extremity he may have been reduced in the course of the difficulty."

We will summarize sufficient of the testimony to indicate the shape of the case which, in our opinion, authorized this charge. A feud had existed for some time in the little town of Celeste, in Hunt County, between two rival livery stables, one owned and run by J. E. Bishop and Bob Mitchell, a brother of the defendant, and the other being owned by Riley Green and Thomas. This feud involved the employes of the two livery stables and others in the town, including the defendant, E. D. Mitchell, and Charley Green (a brother of Riley Green), who lived in Kingston, some three miles distant. The record shows that this rivalry was engendered by opposition in business, and had been progressing for sometime, and reached a crisis about the time the difficulty occurred. On that morning Riley Green had telegraphed to his brother, Charley Green, at Kingston, to come over; and the evidence indicates that after he arrived at Celeste the Green people determined to bring the fight on at the depot, where the rival hacks went to meet the train, about 9 or 10 o'clock. The difficulty was to be brought on by Riley Green making an assault on Bob Mitchell, but it so happened on that particular morning that Bob Mitchell was sick, and did not come to the train. The evidence indicates that the owners of the other stable, after becoming aware of what was going on, prepared for the fray. Early

that morning Bob Mitchell and Yeager attacked John Henley, an employe of the Green stable, while he was up in town. They cursed and abused him. It seems in that connection defendant appeared on the scene, and told the boys to let Henley alone; that they had cursed him enough. Subsequently Henley met Yeager, and challenged him to settle it that morning by fighting it out, and the parties agreed to meet in front of Short's corner and have a fight. Henley went to the Green stable and got his crowd; and Yeager went by the store where the defendant was, spoke with him, then went on down to the Mitchell stable, got the balance of the boys, and both parties met at Short's corner. There Mitchell and Henley confronted each other for a short time. Some suggestion was made by some of the Mitchell party that Yeager was too small to fight Henley, and an altercation ensued between the Mitchells and their friends on the one side and the Greens on the other. Some words passed between them, in which both defendant and deceased participated. During the altercation, while Henley and Yeager were confronting each other, defendant stated to Riley Green that he had heard that he was going to whip Bob, and that he told him that Bob was sick, but he would take his place. Some of the witnesses indicate that some words passed here between defendant and deceased. The testimony shows that the parties on both sides were armed, and ready for a fight, and were willing to fight. It appears that from some cause the difficulty did not come off between Yeager and Henley, Mitchell suggesting that Yeager was not big enough to fight Henley. At this juncture Bishop stated to Riley Green that he understood that he had said that he was the son of a bitch that had whipped his negroes, and run them off from his stable while he was gone. Riley Green at first denied this, and Bishop said he could prove it by Bob Nelson, one of the Mitchell party; and Nelson spoke up, and said that Riley Green had told him that. Green then admitted he had said it, and Bishop told him that anybody that said he had whipped his negroes and run them off was a damn lying son of a bitch. About the time he made this remark, Thomas struck him, and Bishop began to draw his pistol. Thomas struck him again, and knocked him down. About this time Bishop's pistol fired, and Riley Green jumped in and engaged in the fight, either to take the pistol from Bishop or to assist Thomas. According to some of the witnesses, the defendant then drew his pistol and fired at Thomas twice.

The State's witnesses show that Charley Green was standing off to one side, about ten feet away from the parties fighting, and making no demonstration; that after defendant had fired twice at Thomas he then raised his pistol, and fired at Charley Green, whose back or side was to him, two or three times. About this time Charley Green pulled his pistol. Defendant ran, and deceased pursued him some little distance, firing three shots at him. Defendant and some of his witnesses stated that after he had fired two or three shots at Thomas, the deceased, Charley Green, turned on the defendant with his pistol in his hand, and that defendant then shot at him, and he kept on turning and got nearly

around, and he fired the second time at him; that he tried to shoot the third time, but his pistol snapped, and he then ran down the sidewalk, and the deceased fired two or three shots at him.

Some of the defendant's witnesses testified that while Thomas and Riley Green had J. E. Bishop down, beating him, and his pistol was firing, that the deceased fired two shots in the crowd, evidently for the purpose of killing Bishop; and about that time turned toward the defendant with his pistol, and fired at defendant about the same time that defendant fired at him.

The record abundantly shows that bad blood had existed between these two factions for a considerable length of time; that the parties on that particular morning were both looking for the difficulty. The deceased and his friends expected to bring it on at the depot, and defendant's friends unquestionably made an attack on John Henley on the same morning; and subsequently the fight was made up between the factions to come off in front of Short's corner. All of the parties on both sides, except Bob Mitchell, who was sick, appear to have been on hand, and armed for the occasion. True, appellant does not say that Yeager told him what was up, but it is a little singular that Yeager happened in the store where defendant stayed, and showed himself to the defendant, just prior to his going to the stable for the other boys on his side; and when he came back with the other boys, and proceeded to Short's corner, it seems that appellant was on hand. He explains that he had his pistol because he expected to go to a place known as Merit, to a public school entertainment; but he was not then on his way to Merit, but was at the particular place, and armed with his pistol. He stated several times that he understood the parties intended to whip Bob Mitchell that morning, and that he was there to stand in Bob's shoes; that Bob was sick; and his acts and conduct all indicate that he was there ready to engage in the fight if it should come off. Under such a state of case, it occurs to us that the difficulty which ensued was a mutual combat, and the court properly gave a charge on that phase of the case.

In our opinion, the law of imperfect self-defense predicated on mutual combat did not arise in this case. If appellant engaged in the combat at all, it was with felonious intent; it was with a deadly weapon, and under circumstances which indicate that persons on one or both sides in the difficulty might be killed. The court's charge on self defense was predicated solely on the idea that appellant did not go to the scene of the difficulty and was not there for the purpose of engaging in a mutual combat, and that, if there was no mutual combat in the case, and deceased fired at the defendant first, or was making some hostile demonstration indicating a purpose to kill, and defendant then fired on deceased, and killed him, that he would be perfectly justifiable in his action. This was the converse of the proposition presenting self-defense, if there was no mutual combat in the case.

Nor, in our opinion, was there any error in the failure of the court to instruct the jury that, if deceased attempted to take the life of Bishop, defendant would have the right to slay him. True, some of the defendant's witnesses state that the deceased had fired or was in the act of firing at Bishop when defendant shot him. But, viewing the case from the defendant's standpoint, whether this be true or false could not have affected him. He did not see this. There is no pretense from his standpoint that he fired on deceased to keep him from killing Bishop. He fired at deceased solely, according to his testimony, to prevent deceased from killing him.

Appellant complains because the court in its charge limited his right of self-defense to an assault on him with intent to kill him, made by deceased, or to some act done by deceased, showing evidently that he intended to kill defendant. The vice suggested by this charge is that, if deceased was doing some act which indicated that his purpose was to inflict serious bodily injury on defendant, his right of self-defense against such an act would be equally perfect. If there was any testimony in the case showing that deceased, if he made an assault on the defendant, had a less purpose than an intent to take his life, the contention would have great force; but there is no such testimony in this case. If deceased was in the act of making an assault on the defendant at all, it was for the purpose of taking his life. He was then about to shoot him with a pistol, and we fail to understand how the charge in question could have injured the rights of appellant.

Appellant further complains that the court limited his right of self-defense to actual necessity. Strictly speaking, the evidence shows, if anything, an actual, and not an apparent, danger; but the court instructed the jury to regard the circumstances from the defendant's standpoint, and, furthermore, that the doctrine of self-defense is limited to necessity or apparent necessity. This, we think, was sufficient.

In our opinion, there was nothing in appellant's motion for a new trial. Even if it be conceded that some one else fired a shot at deceased, it would not alter the result. The affidavit of newly-discovered evidence is too indefinite, and does not attempt to show who may have fired such other shot. There being no errors in the record, the judgment is affirmed.

*Affirmed.*

[NOTE.—The motion of appellant for a rehearing was overruled December 22, 1897, without a written opinion.—Reporter.]