AUDIE SINGLETON v. THE STATE.

No. 3066.  Decided March 25, 1914.

Rehearing denied May 20, 1914.

**1.—Assault to Murder—Evidence—Undisclosed Motive of Party Injured.**

Where, upon trial of assault with intent to murder, defendant relied upon self-defense, and it appeared from the evidence that the party injured and those with whom he had gone to any place where they knew or had the least idea that they would come in contact with the defendant, and that defendant knew he would pass said place and that these parties were gathered there, and armed himself for that purpose; and, besides, he did not rely for a defense upon the fact that these parties were together at the place stated, but that they made an actual attack upon him, there was no error in admitting testimony showing that the party injured and those with him were at said place for the purpose of repairing a fence and that the fence had been repaired, as this evidence was

not within the rule of law relied on by the defendant about testimony of undisclosed motive. Distinguishing Brumley v. State, 21 Texas Crim. App., 222, and other cases.

### 2.—Same—Defense of Another—Charge of Court.

Where, upon trial of assault to murder, the evidence showed that the difficulty between defendant's female relative and another took place after defendant had fired at the party alleged to have been injured, and there was no evidence that he did so because he believed that an assault had been made on said female relative or that she was in anywise threatened or in apparent danger, there was no error in the court's failure to submit the law of defense of another. Following Mitchell v. State, 38 Texas Crim. Rep., 170.

### 3.—Same—Evidence—Character of Wounds.

Where, upon trial of assault to murder, after a physician had testified that he would not state that the wound on the party alleged to have been assaulted was such a one as might probably result in death, there was no error in permitting him to testify to the character of the wounds with a view of submitting a charge on aggravated and simple assault.

### 4.—Same—Insulting Conduct to Female Relative—Charge of Court— Words and Phrases.

Where, upon trial of assault to murder, it appeared from the record on appeal that the party alleged to have used insulting conduct towards the female relative of defendant was not present on the occasion of the alleged assault and did not participate in any manner therein, any language he may have used could not be attributed to the party injured and those acting with him; besides, the term "wolf" would not be statutory adequate cause, but only a circumstance, which under the charge of the court, the jury was authorized to consider.

### 5.—Same—Absence of Defendant—Swearing Witness.

It being apparent from the record, upon an appeal from a conviction of assault to murder, that the only proceedings had during the absence of defendant upon the trial was the administering of the oath to a State's witness, and the matter was not complained of until in the motion for new trial, the same presented no error.

### 6.—Same—Sufficiency of the Evidence.

Where, upon trial of assault to murder, the evidence though conflicting, sustained a conviction under a proper charge of the court, there was no reversible error.

### 7.—Same—Evidence—Undisclosed Motive—Bill of Exceptions.

Where the ground of objection in the bill of exceptions was that the statement of the State's witnesses occurred in the absence of the defendant, and was not on the ground of the undisclosed motive of the party injured, this latter objection was, therefore, not brought under review on appeal; besides, the record showed that defendant knew that the party injured and those with him had gathered at the place where the difficulty occurred and that he had armed himself because of that fact and was expecting trouble, and there was, therefore, no error in having admitted the testimony for the State showing that the party injured and those with him had gathered at said place to repair a fence, and the rule of undisclosed motives does not apply. Distinguishing Bradley v. State, 60 Texas Crim. Rep., 398, and other cases.

### 8.—Same—Rule Stated—Undisclosed Motive—Self-defense.

The rule is that if one unexpectedly meets his adversary, and from his acts and conduct at the time, viewed in the light of previous threats, is led to believe that his life is in danger, such acts and conduct in the presence of defendant can not be explained by facts unknown to him, but where the defendant was informed that he would meet the party injured and those with him and that he armed himself expecting trouble when he passed them on his way to church, and there was no testimony that could be said to be unknown to

defendant other than that the parties were at the back of the garden instead of being on the porch, etc., the fact that the State introduced testimony that these parties were there to repair a fence and that their purpose was unknown to defendant would not present reversible error. Distinguishing Darnell v. State, 58 Texas Crim. Rep., 585; Pratt v. State, 53 Texas Crim. Rep., 281, and other cases. Following Bozanno v. State, 60 Texas Crim. Rep., 507.

### 9.—Same—Threats—Charge of Court—Self-defense.

Where, upon trial of assault with intent to murder, the alleged threats which were claimed by defendant to have been made by the assaulted party to do defendant serious bodily injury were either not communicated to the defendant or were not seriously made and that he met the party thereafter, etc., there was no error in the court's charge on self-defense on the ground of threats, the court having submitted a sufficient charge on threats in his charge on self-defense.

Appeal from the District Court of Williamson. Tried below before the Hon. C. A. Wilcox.

Appeal from a conviction of assault with intent to murder; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*A. S. Fisher* and *A. S. Fisher, Jr.* and *Richard Critz* and *W. F. Ramsey* and *C. L. Black,* for appellant.—On question of undisclosed motive: Pratt v. State, 53 Texas Crim. Rep., 281; Bradley v. State, 60 Texas Crim. Rep., 398, and cases cited in opinion.

*C. E. Lane,* Assistant Attorney General, and *J. F. Taulbee,* for the State.—Cited cases in opinion.

HARPER, JUDGE.—Appellant was convicted of assaulting John Hunt with intent to murder him, and prosecutes this appeal from such conviction.

The evidence would show on Sunday morning the 6th of July, 1913, John Hunt and his brother, Raymond Hunt, were at the house of their brother, George Hunt, when George Hunt's wife came and told him that cattle had gotten into the garden, and he ought to fix the fence. George Hunt secured a hammer, staples, etc., and asked John and Raymond if they would go with him. They went with him and they repaired the fence. While they were there another brother, Sank Hunt, and Jack Langley came driving by in a surrey and stopped. While they were there fixing the fence Misses Ollie Hunt and Viola Hunt, and Mabel Rife came down to the garden to gather vegetables. The road leading from appellant's house to the Primitive Baptist Church, where there was preaching that day, led by the house of George Hunt and the place where the Hunts were repairing the fence. Appellant, George Maness, Obed Baker and Miss Lydie Singleton, and Coley Fisher, and Miss Clydie Singleton, left the Singleton home in four buggies on their way to the church. When they got near the point where the fence was being repaired is the point where a sharp conflict in the testimony occurs. Appellant says he had received information of sundry and various threats made by the

Hunts, threatening violence, and that when he drew near the point where the Hunts were, John, Raymond and George Hunt started towards him, when he hitched his horse and got out of his buggy; that John Hunt had a gun in his hand, and then testifies: "From the way the Hunts were coming towards me, and the expressions on their faces, and the number of them, I knew they were mad, and felt that they were coming toward me for an unfriendly purpose. When I tied my horse, I walked a few steps north, not exactly towards the Hunts, but kinder back towards the road, leaving them a little to my right. I did not see what the people that were with me doing at this time; the Hunts were crowding me so close I did not have time to watch my people at all. As they came up, Ollie Hunt was a little bit ahead of George and Viola Hunt, and they passed me a little to the left. The other Hunts were coming up, facing me; Jack Langley did not come directly toward me—he came up the fence kinder towards George Hunt's barn. As the Hunts were coming towards me, I said: 'You people have stopped me here on the road and I haven't done you any harm; I am going to church,' and about that time George Hunt was passing to my left, and I just turned around to him, and said: 'George, make Johnnie put up that gun; if we have any trouble to settle, we can settle it without guns.' George Hunt never spoke a word in reply. When I was talking to George Hunt, he was facing me, and I was with my back to the crowd coming up. Just then I heard a gun fire, and I whirled around and jerked my pistol. I supposed that Jack Langley fired that, because when I turned around, John Hunt was fixing to fire at me. I threw my eyes on John first, because he was closest to me, and saw that he was fixing to get the gun up to his shoulder. I rather think the gun he had was a single-barrel shotgun, but I couldn't say positively whether it was a shotgun or a rifle. He just jerked the gun up, and it looked like he was fixing to get it in shape for shooting, and so I shot him, and in an instant he shot at me, and then ran. I then turned to Jack Langley, and did not pay attention to what became of John Hunt's gun. I shot one time at John Hunt, and during that time Jack Langley continued firing at me from where he was over towards the rock fence, about thirty steps east of me. I then fired at Jack Langley two or three times, or maybe four—I don't know how many times, but don't reckon that I hit him. I did not empty my gun at him. Jack Langley was sitting down, and had his gun in both hands when he was shooting at me, and when he got up, I saw that he had quit shooting, and I said: 'Jack, throw your gun away—throw it over the fence, or I will kill you,' and he threw it, but it hit the fence and fell back, and then he turned and ran. I did not shoot any more after that. I then turned around, and as I did so, I saw George Hunt lying on the ground. I did not shoot at George Hunt. I never did shoot in the direction of George Hunt at any time during the fight. I shot at John Hunt, because when I whirled around he was the first one I flashed my eyes on, and I saw him with the gun, and thought he was going to kill me with it. When I saw all these Hunts around there, I just thought

they were going to wind us up, like I had been hearing about. I did not have an ax-handle with me, and did not take an ax-handle out of my buggy. I did not have an ax-handle in my hand at all down there that day. After Jack Langley threw his gun away I turned around and went back to my buggy, and at that time George Hunt was lying on the ground, and I saw him trying to hide something between his legs, which I took for a gun, and I said: 'You better keep that gun hid.' I then threw out my shells; I think I threw out five shells, and had one loaded cartridge in my gun." This is appellant's version of the affair, and it is in the main supported by those who were with him.

On the other hand, the Hunts and those with them say that none of the Hunts were armed, and were in their shirt sleeves. They say, taking Raymond Hunt's testimony which is in the main supported by all those with him: "When I first saw Singleton he was in a buggy, coming down the road. He was in a buggy by himself, and George Maness was in a buggy behind Singleton, and back of George Maness was either the Fisher boy or the Baker boy in a buggy. Fisher and Baker were also in buggies and had the two Singleton girls with them, there being a couple in each buggy. The first thing that attracted my attention was that one of those girls screamed and said to the defendant, 'Don't do that!' and I looked up and saw Singleton turn out of the road and tie his horse; then he went to the back of his buggy and took an ax-handle out of the buggy. While Singleton was tying his horse and getting the ax-handle out of the buggy I also saw George Maness. Maness was tying his horse, or he went through the motion of doing so; I think maybe he wrapped his reins to a bush, and then he went around to the back of his buggy and took a pistol out of it; it looked like a .38 or .45, I don't know which, but I know it was a pistol. When the defendant got the ax-handle he just took it in his hand and started up towards where we were. I did not measure the distance he came towards us with the ax-handle in his hand, but I expect he came fully thirty yards; it might not have been over twenty or twenty-five yards—I am just guessing at the distance. We did not start towards him until he advanced on us with the ax-handle. I suppose he advanced at least ten steps before we started towards him. When we advanced towards him we were advancing towards George's house. I did not have anything with me—stick, knife, pistol, or anything of that kind. I was in my shirt sleeves, and had my sleeves rolled up above my elbows. I saw my brother George, and he was not armed. Singleton was coming towards us with the ax-handle in a pretty good walk, a little above the average walk, and looked like he was angry. . . . When he came across the open place towards us with the ax-handle I suppose he advanced fully ten steps before we ever started out towards him. He was between us and the house, just a little bit the right, and when he came towards us with the ax-handle we started out kind of meeting him. My brother, John, was about seven feet to my left—we were about side by side—and when Singleton got up within about fifteen feet of us he said, 'Stop! I am loaded for you,'

and threw his ax-handle down, and brother John and I both stopped. As to whether I know to whom he was talking at that time, I will say that he was looking right straight at brother John and didn't seem to pay much attention to me at the time. I believe he used some curse words when he said, 'Stop! I am loaded for you!' To my best memory the exact words he used were: . 'Stop, God damn you! I am loaded for you!' The next person to speak was brother John; he said to Singleton, 'Oh, don't do that! What is the matter with you?' I think he called Singleton's name, but am not positive. He said, 'What are you going to do that for? Don't do that!' and he called Singleton's name, too, but just how he used these words. I can't repeat; however, those were the words he used. Singleton then pulled his gun and fired at my brother John and hit him. I know he hit him when he fired. John then sort of reeled and almost fell, but he turned to the left and went up the hill. Singleton then fired at another man right behind me somewhere, and that was my brother George. I saw him shoot at the man behind me; I did not see right then who it was, but saw afterwards that it was my brother George. When he shot at the man back behind me he then turned around and threw his gun down on me and I ran out to one side of the road where there was a hole next to the road and I went into that hole just about the time he shot at me. He did not hit me, but covered me up in smoke. I heard the pistol shot just as I ran into the hole. At that time he was not over fifteen feet from me. He shot at me only once. After I ran off I looked back and saw brother George lying on the ground, and at that time I saw Singleton shooting at Jack Langley, and then saw Langley pull his gun and shoot at Singleton, and then I ran towards the house. I am positive that I heard four shots before Langley fired his gun." This is the version the State relied on for a conviction, and it was shown by Lee J. Rountree and J. F. Taulbee that the fence had in fact been repaired.

In bills of exceptions, and one very lengthy one, it is shown that appellant objected to all testimony showing that the Hunts were at the point designated to repair a fence, and that the fence had been repaired; that appellant did not know this fact, and this is evidence of a motive unknown to appellant at the time. The Hunts all lived there on adjoining farms and that they were at George Hunt's home on that Sunday morning was made known to appellant before he left home, as is shown by the testimony of his witness, Coley Fisher, and he gives this as a reason why he armed himself before starting to go by George Hunt's home. It may be said to be true, that he was not made aware that they were repairing a fence on the road near the house, and neither does the record disclose that the Hunts, or either of them, knew that appellant would pass along there that day. So the record does not bring this evidence within the rule of law relied on by appellant about testimony of undisclosed motive. The Hunts, nor either of them, had gone to any place, where they knew or had the least idea they would come in contact with appellant, so far as this record discloses; while appellant had gone, as

he had a right to do, where he knew he would pass the place where he had been informed that morning the Hunts were gathered, and he says for this reason he armed himself. Again, appellant does not rely for a defense of his action upon the ·fact that the Hunts were together at the place where the fence was repaired, for he testifies had they remained at this place he would have driven on by, paying no attention to this fact, but the fact that they advanced, John Hunt being armed, towards him in a threatening manner, was the reason why he got out of his buggy and hitched his horse; he furthermore says that he made no demonstration of any character until after he was fired on by John Langley, when he reached for his pistol..and as he did so, John Hunt, attempted to shoot him with a gun, when he shot John Hunt. And if this state of facts is true, appellant would be guilty of no offense, regardless of the reason why the Hunts, instead of being in the house, were down there near the road at the fence. On the other hand, the State's case is that when appellant got near them, he tied his horse, got out of the buggy and with an ax-handle in his hand, started towards the Hunts, when the Hunts advanced towards him in their shirt sleeves unarmed, and before they or any of them, had made any hostile demonstration, shot John Hunt, shot George Hunt, shot at Raymond Hunt and John Langley. Appellant relies on an actual attack on him, and all his testimony goes to that point, and not upon appearances of danger, viewed from his standpoint from the fact they had gathered at the fence, and from some word or act then done (not amounting to an actual attack) for a defensive theory. The fact they had gone down there to repair and had repaired a fence, would not and could not be such an explanation·of their acts on this occasion as could or would injuriously affect appellant, when his witness Coley Fisher testified: "I saw four or five persons at George Hunt's when I passed there, going to Singleton's. I said something to the appellant, Audie Singleton, with reference to seeing these parties at George Hunt's, and what was the matter there." Appellant testified that this witness told him this fact, and gave that as his reason why he armed himself before going by George Hunt's. It is not a case where the person on trial was approached by the person assaulted; it is not a case of an unexpected meeting when he was not looking to meet such person; it is not a case where the assaulted party had gone to a place where he would likely meet the person on trial, but a case where the person on trial deliberately went where he knew he would necessarily pass by where they were, and under such circumstances the rules of law as announced in Brumley v. State, 21 Texas Crim. App., 222; Gilcrease v. State, 33 Texas Crim. Rep., 619; Ball v. State, 29 Texas Crim. App., 107, and other cases cited by appellant do not apply. We do not wish to be understood as questioning nor limiting the rule of law as announced in those cases, for in each of them it will be seen it· was where the *deceased had gone* to the place where they knew they would or would likely meet the person on trial, or where the meeting was unexpected, and not a case where the person on trial had gone where he knew beforehand,

or had been told he would come in contact with the person assaulted, and had armed himself because he knew that by going the road he intended to travel he would himself bring about the meeting. Not that he did not have the right to go this road, but certainly the reason for the persons being at the place could not surprise him when he knew before he traveled the road he would necessarily meet them.

The next complaint is that the court erred in not instructing the jury at appellant's request that if John Hunt or those with him, or either of them, were making an unlawful attack on Clydie Singleton, appellant should be acquitted. Of course, appellant would have the same right to defend against an unlawful attack being made on his sister that he would have to defend against an attack made on him. But at the time he shot John Hunt, had there been an attack made on Miss Singleton, or did it reasonably appear to appellant that anyone was about to make an attack on her? Miss Clydie testified in the case and said: "Ollie Hunt came up to the buggy in which I was sitting and told me to get out of the buggy or she would pull me out, and then hit me. *This occurred after the shooting.*" Again, she said: "Ollie Hunt was the one that came up to the buggy when the shooting was going on and jumped on me. The trouble between Ollie and myself took place while part of the shooting was going on; *it was after John Hunt was shot.*" Appellant testified, "I did not see the fight between my sister and Miss Ollie Hunt. I did not see any part of their fight, and did not see anyone parting the girls." The testimony and all the testimony shows that this difficulty took place after appellant had shot John Hunt; he saw no part of it, and in his testimony, nor any other testimony in the record is it even suggested that in firing the first shot he fired, he did so because he thought or believed an assault had been made, was about to be made, or that she was in anywise in threatened nor in apparent danger. Consequently the court did not err in refusing the special charge requested. We thoroughly agree with appellant "if the evidence for the State, or the evidence offered in behalf of the defendant, or the evidence taken as a whole, raises a defensive issue, it should be submitted to the jury," but in no line of testimony in the record before us is it even suggested that appellant in shooting did, so in defense of his sister, and it is as it appears to him, that defense of any character is predicated. In Mitchell v. State, 38 Texas Crim. Rep., 170, this court said: "On trial for murder, where from defendant's own testimony it appeared that he fired upon deceased solely to prevent deceased from shooting him, it was not error for the court to fail to charge upon his right to kill if deceased was attempting to take the life of his friend, and especially so where, if deceased was making such attack on his friend he did not see it."

Appellant complains that Dr. Moses, after describing the wound on the day he was called to examine it, was permitted to testify: "The first thing he suffered from when I was called in to see him on July 6, 1913, was hemorrhage, shock and weak pulse, and all the symptoms that go with hemorrhage, such as cold extremities and weak, fast pulse,

accelerated breathing, due to bleeding into the plural cavity, pressing on the lung, together with the effects of trauma or tearing which would cause pain. That was his condition when I saw him the first time and also when I saw him the second time. When I saw him in August, 1913, he was suffering from the effect of infection, he had developed quite a large collection of pus between the lung and chest wall, that was pressing on the lung, and causing rapid respiration; his breathing was interfered with and he had considerable fever, and his pulse was fast, due to the fever and the effects of weakness." The court in approving the bill says: "Questions by the State which called for the testimony set out in this bill were, at first, excluded by the court upon the objection of the defendant; afterwards, during his testimony, Doctor Moses testified that he would not state that the wound was such as might probably result in death. The State then renewed the question as set out in the bill, and the objection was then overruled." After the doctor had testified that he would not state that the wound was such a one as might probably result in death, the evidence was admissible on the issue if appellant was not guilty of assault to murder, whether the wound was of the character to call for a charge on aggravated assault, or simple assault. This testimony shows the bullet did inflict serious bodily injury, and the court submitted aggravated assault in his charge.

The only other criticism of the charge of the court made at the time same was submitted to appellant's counsel is that the charge is erroneous in that it "did not present the issues as to defendant's right to act upon insulting conduct and words of John Hunt and those acting with him towards and concerning Clydie Singleton, which should be submitted as to the issue of reducing the offense to aggravated assault." In the brief it is submitted that as witnesses had testified that J. W. Hunt said, "The one who wrote a certain card was a wolf," and this referred to Miss Clydie Singleton, this raised the issue of insulting conduct towards and concerning a female relative. J. W. Hunt was not present on the occasion of the shooting, did not participate in any manner therein and any language he might have used (he denied using such language) could not be attributed to his children, not to any person present on the occasion of this shooting. And then again, the term "wolf" would not be statutory adequate cause, but would be a circumstance to consider along with other circumstances, if any, to be considered by the jury, and the court instructed the jury:

"You are instructed that any condition or circumstance capable of creating and which does create sudden passion, such as anger, rage, sudden resentment or terror, rendering the mind for the time incapable of cool reflection, whether accompanied by bodily pain or not, may be adequate cause; and whether such adequate cause existed for such sudden passion (if any there was) it is for you to determine; and in determing this question as well as all other matters before you, you will consider all the facts and circumstances in evidence in this case." In connection with this charge the court instructed the jury that if appel-

lant "was by some adequate cause (as herein explained) moved to such degree of anger, rage, sudden resentment or terror as to render him incapable of cool reflection" he would be guilty of aggravated assault only. Thus presenting the issue in as favorable light as the evidence called for.

It is shown by another bill that Dr. W. H. Moses was sworn to testify, while the defendant was in an adjoining room consulting with his lawyers; Judge Richard Critz testified that he was of counsel for appellant; that during a recess of court, appellant and his counsel stepped in the judge's room to consult. That upon the reconvening of court, as he returned to the court, Dr. Moses was taking his seat as a witness and was then sworn as a witness; that appellant was not in the courtroom at this time, and he stepped to the stenographer and asked him to make a note of this fact, and as he was giving these instructions to the stenographer, the defendant came into the courtroom. He further testified:

"The matter of the witness being sworn while the defendant was in the private office of the district judge, was not called to the attention of the court, and no request was made that the witness be resworn. The judge's private office is situated across the hall from the entrance to the courtroom, but a person in that office could not hear the witness or anybody else sitting on the witness stand. I knew at the time that the defendant was not present when the witness Moses was sworn. I don't remember whether the doors were open or not. I did not call the attention of the court or counsel on the other side to the fact that the witness was sworn while the defendant was out of the courtroom; I was not trying the State's case. I did call the stenographer's attention to the matter by requesting him to make a note of the fact. I want to state further that when the defendant came into the courtroom again that he passed right in front of the State's counsel and in full view of them; I don't know whether they saw him or not, but I know he passed right along over there (indicating), and came over here and took his seat." It being apparent that the only proceedings had during the absence of appellant was administering the oath to Dr. Moses, and the matter was not complained of until in the motion for new trial, it presents no error.

The court in his charge fairly and fully presented every issue raised by the testimony; while the testimony is seriously in conflict, that offered by defendant, showing that he acted in self-defense, while that offered by the State, make a case of assault to murder, and under such circumstances no error being presented by the record, the judgment must be affirmed.

*Affirmed.*

ON REHEARING.

May 20, 1914.

HARPER, Judge.—Appellant has filed a motion for rehearing in this case, in which he reiterates every ground in the motion for a new trial, but in an able and exhaustive argument filed he presents only one question, that is, the court committed reversible error in permitting the Hunts

and others to testify that they had gone to the back of the garden to repair the fence, appellant's insistence being that their reason for being at this point was wholly unknown to appellant, and under the rules of law announced in Brumley v. State, 21 Texas Crim. App., 222; Ball v. State, 29 Texas Crim. App., 107; Clay v. State, 44 Texas Crim. Rep., 129; Pratt v. State, 53 Texas Crim. Rep., 281; Darnell v. State, 58 Texas Crim. Rep., 585, and Bradley v. State, 60 Texas Crim. Rep., 398, this testimony was inadmissible. Counsel for the State has also filed an able argument in the case. As is to be expected, counsel in their respective briefs state the evidence from the viewpoint of each, and present a wide divergence. We are supposed to be wholly unbiased and to take a reasonable view under all the testimony adduced, and state such deductions as naturally arise from the entire record, therefore we can not adopt the statement of the case as made by either of them. George Hunt and others testified that he and his brothers were at George Hunt's house that morning, and that his wife came in and informed him that cattle had broken the fence and gotten in the field and eaten some corn and a part of the garden vegetables, and that he and John and Raymond Hunt had gone there to fix the fence. That while they were there Sank Hunt and Jack Langley drove up. The State also introduced evidence showing that the fence was fixed. Appellant objected to all this testimony. The court, in approving the bill, says the only objection made to the testimony was that it "called for a statement of facts which occurred in the absence of the defendant—that other grounds of objection stated in the bill were not made to the court, and have no place in the bill." It is thus seen that the objections now so vigorously urged in this court were not made at the time the testimony was offered in the trial court, and for that reason the bill would present no reversible error, for if that was all the objection offered, the testimony over his objection would be admissible as stated by the court as shedding light upon who began the difficulty. Hunter v. State, 59 Texas Crim. Rep., 439. But if we consider all the objections now urged by appellant to this testimony, towit: "Because to admit such evidence to go to the jury would be to create the impression on the minds of the jury, that this defendant was being tried upon the real facts, and circumstances and not on the facts and circumstances as they appeared to the defendant from his standpoint at the time of the difficulty, and would be prejudicial to this defendant for the reason that it would be allowing the jury to have and consider as evidence in the case and against this defendant matters and things that could not and were not known to him before and at the time of the difficulty, and would be charging the defendant with reason and motive locked up on the minds of others, that could not be known to this defendant."

To get a correct view of this matter we must consider the testimony adduced on this trial. Coley Fisher, a witness for the defendant, testified at his instance: "I passed by George Hunt's place that morning in going from my home to Mr. Singleton. When I passed George Hunt's on my

way over to the Singleton house that morning I saw Charley Hunt and someone whom I did not know on the gallery; Charley Hunt was the only one I recognized. Charley Hunt is George Hunt's son, but I don't know how old he is; I suppose he is about sixteen or seventeen years old. I saw four or five persons at George Hunt's when I passed there going to the Singleton place. I believe I said something to Audie Singleton with reference to seeing those parties there at George Hunt's.; I said something to him about a crowd being there, or what was the matter there, or something of the kind." Then on cross-examination he testified: "I said that in going over to the Singleton's I passed by George Hunt's place that morning. I saw Charley Hunt out close to the lot, unharnessing a horse, but could not tell who the rest of the people were that I saw there. I saw three or four or five men there; I just noticed them when I passed there that morning, and I asked Audie Singleton something about the crowd being down there. I did this because I didn't know but what there might be something the matter—I didn't know how it came that so many people were up there at the Hunt house." Obed Baker, another witness for defendant, testified: "I was present at the difficulty. When I left home that morning I went up to the Singleton's to bring Miss Lydia Singleton to church, and in going up to the Singleton's I went the road which passes by George Hunt's place. I saw several parties, men and women, on the porch at George Hunt's house when I went by there. I would think that there were six or seven people present at George Hunt's place when I passed, but I did not count them. It was somewhere between ten and half past ten when I passed George Hunt's house. After passing there, I went to Mr. Singleton's house, and when I got there I had a conversation with Audie Singleton, who met me out at the lot and asked me whom I had seen, or whether I had seen anybody down at Hunt's, and I told him I had seen a crowd down there, and told him where they were." On cross-examination he testified: "When I first got there, Audie met me out at the lot which is about twenty-five yards north of the house. Nobody was with him when he talked to me out there. He did not ask me anything out there at the lot, except whom I saw at George Hunt's, and I told him I saw a crowd down there. I know that there are a good many Hunts around there." Defendant himself testified: "Just before Coley Fisher went into the house, or after he had been in the house, he asked me if there was. something the matter at the Hunts, or what that crowd was doing there. I told him I did not know anything about it, and I asked him a few particulars. He then said that he saw a crowd out on the porch down at Hunt's. When Obed Baker came up, I was out at the lot, and I stopped him there, even with the lot, and asked him if he had seen anybody down at George Hunt's, and asked him about the crowd, and where they were, and all about it; he told me that he had seen a bunch there on the porch, the same as Fisher had told me. On the Saturday before Russell Riley was talking with me at Liberty Hill, with reference to the Hunts; he was telling me about going down to old man Wesley Hunt's to see that

postcard, and telling me something concerning the conversation they had had; he told me that the Hunts were mad at me and that I had better watch out—that he was afraid we were going to have trouble, and this, that and the other. I don't remember all he did tell me. I thought from what he told me, that the Hunts were mad at me, and while I really did not think that there would be any trouble, still I was watching for it too, expecting it, kinder. On the Saturday before this trouble, while I was at Liberty Hill, August Miller told me about John Hunt trying to borrow his knucks to give me a whipping with. He told me that John Hunt came to him and asked him if he had a pair of knucks, and that he (Miller) told John that he did not have a pair of knucks, but had one knuck, and John Hunt told him to bring it back to the thresher, where he was hauling oats to have threshed. So when he (Miller) got back, John Hunt came to him and asked him if he had brought the knuck, and he told him he had not. Miller also told me that John Hunt had said to him that he wanted to work my head over with the knucks. Tom Murray told me that he was with Russell Riley when Riley went down the road to Wesley Hunt's, and told me something concerning their fuss. Riley told me that the Hunts were mad at me about a postcard that had been sent to Ollie Hunt, and that the Hunts were going to get on to me the first thing I knew, and for me to watch what I was doing or something like that. My mother told me about hearing the Hunts talking over the phone; she said she heard them ringing for Bud Hunt to come over and bring his boy—that they were going to have some fun just before church time. I think my mother told me about this the evening before I had the trouble with the Hunts. George Maness told me that on Friday, July 4th, at the picnic at Liberty Hill, he had been with two of Mr. Baker's girls, and had taken them home that evening, and as he passed back by George Hunt's place Jack Langley came down the road and stopped him, and asked him (Maness) if he or any of the Singletons had sent that postcard to Ollie Hunt, and Maness told him they had not, and that then Jack Langley made some sort of a remark about it, and used some curse word; that about that time Charley Hunt came down the road, and said: 'We are going to have a cleaning up,' and Jack Langley said: 'Yes, we are going to get hold of Audie the first time we seen him down the road,' or some remark like that." He said this was all that he had heard that the Hunts or any of them had said about him. The record discloses that appellant was with the Hunts on Monday or Tuesday before the shooting; that he was with them again on Wednesday or Thursday before the shooting, and some of them helped him load his wagon; that he saw a portion of them at the picnic on Friday before the shooting took place on Sunday, and at all these times the conversation was friendly; however, he claims to have heard all these threats on Saturday. He said before leaving home on that Sunday morning after he had harnessed his horse, he went in the house and got his pistol, and put it in his pocket. That it shot .38 Winchester cartridges and could shoot six times. He then says he got in his buggy and drove

down the road that he knew would lead him by where he had been informed the "Hunts had gathered," saying, "The reason I did go by there in spite of the fact that I was expecting trouble, was because I had business going that way; it was a public road, and I had a right to travel that way."

Thus it is seen that appellant himself and two of his witnesses say he knew before he left home that the Hunts had gathered at George Hunt's place; that he says he armed himself because of that fact and went the road by George Hunt's in spite of the fact he was expecting trouble. Then how could the fact that the Hunts were together be said to be a matter not known to him, or that they were on George Hunt's place, be said to be unknown to him? It is true he had been told they were at the house on the gallery, and he got in his buggy to deliberately drive by there notwithstanding he says he was expecting trouble, for he says he had a right to, but how could the fact that they were at the back of the garden instead of on the gallery have changed the appearance to him from his standpoint, and the further fact that they had fixed the fence, be an undisclosed motive, such as would affect his right of self-defense as viewed from his standpoint? The law is, as contended by appellant, that if one unexpectedly meets his adversary, and from his acts and conduct at the time, viewed in the light of previous threats, leads one to believe his life is in danger, such acts and conduct in the presence of defendant can not be explained by facts unknown to him, but the facts in this case present no such state of case. He says that they were sitting on the grass when he drove up; then how could the fact that they had fixed the fence prior to that time affect in the least his viewpoint? He says that he had been informed that morning that the Hunts were together; then he knew that fact before he went near George Hunt's place. What act or conduct of the Hunts or either of them was done or said in the presence of appellant that was sought to be explained? None. Did the fact that they had repaired a fence tend to explain or tend to make appearances different to defendant than if this testimony had not been admitted? No testimony was admitted that could be said to be unknown to appellant other than that they were at the back of the garden instead of being on the porch at the house, and this fact in and of itself, if nothing further had taken place, could or would not furnish a defense to shoot John Hunt. None of the cases cited by appellant have any application to a state of facts similar to the facts adduced on this trial.

In the Bradley case, supra, it was a case where appellant met the deceased at an unexpected place, his son having a gun, and it was held error to permit the State to prove that they had gone to hunt the cows and the son had carried the gun to shoot an owl. There is nothing in the record to suggest that the appellant in traveling the road he did, knew he would meet the deceased, and if meeting him, if his son being armed, and if from their acts and conduct on that occasion he was led to believe his life was in danger, it was correctly held, under the au-

thorities, that the purpose in carrying the gun could not be shown to be an innocent one. In the Darnell case, supra, the evidence discloses that Masters, the injured party, there having been a misunderstanding between him and Darnell, walked up to Darnell, and put his hand on his shoulder, and said, "Mr. Darnell, what about" when the appellant shot. The witness was permitted to detail what he had intended to say, which would show an innocent intent in his acts and conduct, when from the past occurrences, appellant had a right to view the matter differently. Thus it is seen it was acts and conduct done in the presence of defendant that was sought to be explained away.

In the Pratt case, supra, appellant had testified that deceased had told him he was coming to the store next morning and break his neck; that when he saw him coming, from his acts and conduct he thought deceased was going to do him violence. It was held error to permit the State to show that he was on his way to see Medlin for an innocent purpose, of which appellant was unaware.

Under the facts in the Clay case, supra, it has no application to a case of this character. There is nothing testified to about an undisclosed motive, and would have no bearing on the issue of self-defense, nor who began the difficulty. It was testimony that tended to support not disprove any issue in the case. The case was reversed on the ground that the court erred in submitting the issue of provoking the difficulty.

In the case of Ball v. State, 29 Texas Crim. App., 107, the opinion says the appellant invoked the doctrine of apparent danger, and his right to act upon it as it appeared to him. The appellant testified that deceased had threatened him, had insulted him on the streets, and had tried to run him out of town; that a few hours before the killing deceased had threatened to horsewhip him; the appellant worked in the Hesperian office, and was standing near that office when deceased came out of the newspaper office and began cursing him and struck at him, when he shot.

The State's case was that the deceased came out of the newspaper office and started towards the postoffice and when he reached a point in front of defendant he stopped, but made no hostile demonstration. It is thus seen that deceased had gone to the office of defendant, after having made threats to horsewhip him that day, besides other threats, and on coming out of the office, when he saw defendant, he stopped directly in front of him, if he did no more, but according to defendant's testimony he cursed him and struck at him. Under this state of facts defendant had a right to believe that deceased was then in search of him, having gone in the office where appellant stayed, and it was held to be error to permit his wife to state when he left home he "told her he was going to the postoffice and would be right back." Thus making his mission innocent, when the facts in the case show appellant would have the right to believe that he was in search of him, appellant, to carry out the threat.

In the Brumley case, supra, the evidence showed that a horse belonging to appellant Brumley had been killed, that a complaint had been

filed against one Williams, who was related to Isaac McAdams, who was afterwards killed. At the trial. McAdams had a difficulty with the step-son of Brumley and accused him of swearing a lie. He also threatened Brumley's life, saying that he would cut his heart out, chew it up and spit it out. Brumley applied to the justice to have McAdams placed under a peace bond but it was not issued. A few days thereafter Brumley was at his home when McAdams came riding up, that Brumley spoke to him, saying good morning, when McAdams said, "You are a d——d theif, and I believe you killed your own horse," and started to throw himself off his horse on the opposite side to Brumley when Brumley shot him.

The State introduced evidence that instead of going to Brumley's house to renew the difficulty, as it would reasonably appear to Brumley, that McAdams was in fact on his way to his brother's house to borrow a wagon, a fact unknown to appellant. Held, error. The court in that case laid the law down as follows:

"It is a general rule that, 'In cases where it is material to inquire into the demeanor, conduct, and mental feelings of an individual, at a particular period, the declarations made and the expressions used at the period in question are in their nature original evidence. . . . Verbal and written declarations are often said to be admissible as a part of the res gestae. As such they are most properly admissible when they accompany some act, the nature, object, or motives of which are the subject of inquiry. In such cases, words are receivable as original evidence, on the ground that what is said at the time affords legitimate, if not the best means of ascertaining the character of such equivocal acts as admit of explanation from those indications of the mind which language affords.' (1 Phil. on Ev., Cowman & Hill's Notes, 3 ed., 1859, pp. 181-185.) . . .

"It is a rule not only statutory, but of almost universal acceptation, that a party who acts upon reasonable appearances of danger, and that whether danger is apparent, or not, is always to be determined from the defendant's standpoint. . . .

"Now in this case it was immaterial, so far as defendant's rights were concerned, what were the motives of the deceased McAdams in coming to the house of defendant on the fatal morning of the homicide; that is, it is clearly immaterial whether his mission was a peaceable one, towit: going to his brother's for the purpose of getting a wagon. Such motives and intention could not possibly have affected defendant's conduct, because the evidence shows that they had never been communicated to him, and that he was wholly ignorant of them. He should not be held in anyway bound by such undisclosed motives and intentions, and, so far as he was concerned, they could not throw any light upon the immediate transaction."

To the rule of law as laid down in this case we give our assent, as stated in the original opinion, but the facts in this case do not bring it within the rules of law as thus announced. McAdams had gone to Brum-

ley's home, after threatening to cut his heart out, and by his acts and conduct would lead one to believe that he was about to execute his threat, and if he in fact was going to his brother's it was unknown to appellant. In this case John Hunt had not gone to appellant's home, but appellant had come to where he had been informed the Hunts were that morning, each and every one of the Hunts living on that farm, as appellant admits he knew, and in each and every one of the cases cited by appellant is where the deceased had gone to where he, the deceased, knew he would likely meet the appellant, and not where the appellant had gone where he knew he would meet his adversary, and had armed himself for that reason, unless it be the Bradley case, supra. However, it appears that in that case the State was allowed to explain why one of the Tuckers had a gun—that he had it to kill an owl, when appellant had testified that the father had just called the boy with the gun, saying: "Come on, Jim," at the time he picked up.a stick to assault him, and this was held to be erroneous, because it was proper for the jury to pass on the case as it appeared to him at the time. In this case appellant testified John Hunt had a gun, but no witness sought to explain why John Hunt had a gun, if he had one. No explanation was introduced of any act or conduct or word spoken in the presence or hearing of the defendant, and the facts in this case bring it squarely within the rule announced in the case of Bozanno v. State, 60 Texas Crim. Rep., 507, wherein this court held: "The first is that the court erred in permitting the witness, Mr. Albert Dunlap, over the objection of defendant, to testify as to the movements and actions of the deceased, Denny Harris, on the day of the homicide and prior thereto, because said actions and movements were not in the presence of appellant and there was no testimony showing that he had any knowledge of said actions and movements of Denny Harris, and appellant could not be charged with the knowledge of such movements and the causes thereof. This witness testified in substance that deceased left her house about 11:30 o'clock the morning he was killed; that he came by where she was stopping with her daughter; that he had a lead horse; that he stated he was going out to George Foreman's to take the horse there, and that he was going to the next house to get a saddle. This, it appears from the statement of facts, was objected to for the reason that appellant was not present and the movements of Harris on that day can not be charged to him and is no evidence against him. The testimony was explanatory of the presence of the deceased at the place where he was killed, which was quite a distance from the place where his mother saw him, and was a mere matter of inducement. The cases in which the actions, declarations and intentions of a decedent are held not to be admissible against a defendant who has no notice of them, has always been limited to cases where the issue of self-defense arose in the case, *and where such acts and movements of the deceased could be held to be hostile in their character,* and where such defendant had a right to act upon an apparent hostile movement towards him which might, if the rule permitted it, be shown to be in fact innocent. It can

have, we think, no application to such a case as this, and the objection is wholly untenable."

It is true that self-defense was not an issue in that case, but it will be noted that the court holds that it is "Where such acts and movements of the deceased could be held to be hostile in their character, and where such defendant had a right to act upon an apparent hostile movement towards him which might, if the rule permitted it, be shown to be in fact innocent." We agree that the authorities from the Brumley case, supra, on down to the present time all hold that "such apparent hostile movements" of the deceased, judged of from defendant's viewpoint at the time can not be explained away by showing them innocent and void of intention to give offense, if such was unknown to the defendant at the time. But as before said, no evidence was introduced or sought to be introduced that would tend in the least to explain or show any act, word or conduct of John Hunt or either of the others with him which was said or done in the presence of the defendant in this case was with an innocent intent. The fence had been fixed before he arrived on the scene he says, and they were sitting down talking; he knew they were together that morning on George Hunt's place, if his testimony and the testimony of his witnesses, Fisher and Baker, is to be believed, and no one disputes them on this point. No testimony was introduced showing why Jack Langley had his pistol, and no one explained why the Hunts or either of them had a gun or pistol, if either of them had one. The fact that John Hunt, or either of the other Hunts, had a weapon of any character is denied emphatically by all the witnesses introduced by the State who were present, and they say that John Hunt and his brothers were in their shirt-sleeves and had nothing in their hands. It is true that appellant and some of his witnesses say that John Hunt had a gun in his hands, but other of his witnesses who were present at the time would not testify that he had a gun on that occasion. Appellant also claims that he saw George Hunt with a pistol after he fell, while his two sisters and all his witnesses say that George Hunt was not armed; but if either George Hunt or John Hunt had a gun on that occasion, the State did not seek to introduce any evidence to explain why they had the guns.

As to threats made to do appellant serious bodily injury, we have hereinbefore copied what appellant says was told him. He says that George Maness had told him that Jack Langley and young Charley Hunt had said that his sister wrote the card, and they would "get hold of Audie (appellant) the first time he came down the road." He introduced Maness as a witness, and Maness says that he asked Langley and Charley Hunt if they believed the card came from the Singletons, and they said *they did not,* and this is what he told appellant, and they told him nothing about them going to get hold of him the first time he came down the road. Thus instead of proving such a threat had been made or communicated, his own witness, introduced by him to prove up this threat, says that instead of accusing any of the Singletons of sending

the card, Langley and Charley Hunt stated that *they did not believe* it came from Mr. Singleton's, and all they said was about whoever sent the card to Miss Hunt, and this is all he told appellant.

In regard to the threat that John Hunt was trying to borrow brass knucks from the negro, A. C. Miller, and had said that he wanted to work his (appellant's) head over, John Hunt denied making any such statement, and that he had sought to borrow any knucks, but the negro testified that John Hunt had tried to borrow the knucks from him, and had said he wanted to put a new head on Mr. Singleton, but on cross-examination the negro admitted that at this time appellant and John Hunt were in the field at work together, and they had no fuss that day, and Hunt did not claim that appellant had done anything to him. It was also shown that after this alleged conversation, appellant and John Hunt and some of his brothers were working together with some oats, all of which facts were known to appellant before the shooting.

The only other threat is the one that he says Russell Riley told him— that he was down at old man Hunt's, and they had talked about the postcard, and the Hunts were mad at him and that he had better watch out. Appellant called Russell Riley as a witness, and he said he went down to Mr. Wesley Hunt's to see about the card, as his brother's initials were signed to it. That Wesley Hunt had said he believed the Singletons had written it, and whoever sent it was a low-down cowardly wolf and had to eat it. That this is what he told appellant. Wesley Hunt was the father of John Hunt and George Hunt, and was not present when the shooting took place; neither was John Hunt present when the remark was made about it. However, Wesley Hunt denies making any such remarks. Thus to put it in the strongest light for appellant, as the testimony he offers makes, was that Wesley Hunt, the father, had said that the Singletons wrote the card, and they had it to eat, and he was not present when the shooting took place; that Jack Langley and Charley Hunt had made unkind remarks about the one who wrote the card, at the same time saying that they did not believe the Singletons wrote the card, and that John Hunt had tried to borrow some knucks, saying he was going to put a new head on appellant, yet appellant knew before the shooting that when it was claimed this remark was made he was at work with John Hunt in the field, and no unkind words of any kind were spoken; that he was there on the Hunt farm, and no effort was made to do him violence; that at the 4th of July picnic (on Friday before the shooting on Sunday) he had seen some of the Hunt boys at the picnic and no unkind word was spoken, and these are all the threats he claims were ever made or communicated to him. He had been with them three times that week, going to Georgetown in a buggy with one of them, and meeting them twice when John Hunt was present, as well as several of the others, and they were all friendly on these occasions.

We have written at length on this motion for rehearing, because of the insistence of appellant, and the able argument of his counsel, but we can not and do not agree to the conclusions as to the facts shown as

stated by them in their argument, and instead of drawing our own deductions from the record, we have been careful to state what the witnesses' testimony in their own language was, and under the evidence in this case we hold that while the rules of law as stated in the Brumley case, supra, have always been followed in this court, they have no application to the facts in this case, but under the evidence the case comes peculiarly within the rules announced in the case of Bozanno v. State, 60 Texas Crim. Rep., 507, hereinbefore cited and quoted from, and the motion for rehearing is overruled.

And while perhaps it is unnecessary in this case, we will say in this connection that if one of the issues in a case is, "who began the difficulty," if the evidence does not tend to explain away any hostile acts, movements or words of the deceased in any case, but their weight and tendency would only bear on who began the difficulty, such testimony would be admissible on that issue alone, but would not be admissible if the appellant relied on such as hostile acts and conduct of the deceased in the light of previous threats and conduct to show that it reasonably appeared to him at the time from such acts and conduct that his life was in danger, and for this reason he shot.

The motion for rehearing is overruled.

*Overruled.*