## J. T. LAKE v. THE STATE.

### No. 3989.   Decided March 15, 1916.

#### 1.—Murder—Principal—Charge of Court—Presence of Defendant.

Where, upon trial of murder, the evidence sufficiently raised the issue that defendant was a principal as charged in the indictment and had conspired with another to kill the deceased, or knowing the unlawful intent to kill, aided such other person by acts or encouraged him by words or gestures to kill the deceased, he may be convicted as a principal even though he may not at the time of the killing have been bodily in the immediate presence of the actual slayer, and it became the duty of the court to apply the law of principals and properly submit the issue to the jury for a finding.   Following Serrato v. State, 74 Texas Crim. Rep., 74, and other cases.

#### 2.—Same—Principal—Keeping Watch—Procuring Arms—Charge of Court.

Where, upon trial of murder and the conviction for said offense, the evidence did not raise the issues, either that defendant kept watch so as to prevent the interruption of the one committing the offense, or that he purchased arms to assist in the commission of the offense, and the court submitted in his charge to the jury both of these issues and authorized the jury to convict the defendant if they believed either of such issues, the same was reversible error.

#### 3.—Same—Principals—Charge of Court.

Where, upon trial of murder, the defendant's acts and declarations in connection with his son, who actually fired the fatal shot, were such as to raise the issue and require the submission of the same to the jury whether or not the defendant was a principal, the court's charge on principals on this phase of the case was proper.

#### 4.—Same—Self-defense—Resorting to Other Means to Prevent the Injury.

Where, upon trial of murder, the evidence hardly raised the issue of self-defense, unless it showed that defendant's son, who did the killing aided and encouraged by defendant, resorted to all other means for preventing any injury upon him by deceased before he had the right to shoot and kill him, which was not shown, but the court nevertheless submitted manslaughter and self-defense, the defendant could not complain.

#### 5.—Same—Provoking Difficulty—Self-defense—Charge of Court.

Where, upon trial of murder, the evidence did not raise the issue of provoking the difficulty, even if self-defense was raised thereby, it was error in the court below to submit any question of provoking the difficulty.

#### 6.—Same—Evidence—Conduct of Counsel for the State.

Where the bills of exception to the exclusion of certain testimony and to the question asked by the district attorney presented no error, they need not be reviewed on appeal.

Appeal from the District Court of Wood.   Tried below before the Hon. R. M. Smith.

Appeal from a conviction of murder; penalty, twelve years imprisonment in the penitentiary.

The opinion states the case.

*Harris & Britton, J. H. Beavers,* and *W. G. Russell,* for appellant.— On the question of court's charge on principals:   Tooney v. State, 5 Texas Crim. App., 163; Askey v. State, 15 id., 558; Paderes v. State,

45 S. W. Rep., 914; Meneffee v. State, 67 Texas Crim. Rep., 201, 149 S. W. Rep., 138; Hiles v. State, 159 S. W. Rep., 223.

On question of keeping watch: Menefee v. State, supra.

*C. C. McDonald*, Assistant Attorney General, for the State.—On question of self-defense: Thumm v. State, 24 Texas Crim. App., 667; Lander v. State, 12 Texas, 462; Hamons v. State, recently decided.

PRENDERGAST, PRESIDING JUDGE.—From a conviction of murder, with twelve years in the penitentiary assessed as the punishment, this appeal is prosecuted.

Because the case must be reversed, we will not specially discuss the testimony. We will make merely a general statement. On some points the testimony is in direct conflict, that of appellant himself contradicting the other disinterested eyewitnesses. It will not be necessary to state this conflict.

The killing occurred late one evening. About 3 o'clock that evening appellant took his neighbor and friend, Mr. Black, from Quitman, where they both lived, in his buggy about a mile east, to his farm to get roasting ears and peas. In going, they met deceased, Louis Thorn, who, with Mr. Chreitzbergh, was in deceased's buggy going towards Quitman. Chreitzbergh was quite drunk and sick therefrom. Appellant suggested to them not to go to Quitman in that condition, for they might be arrested. He asked deceased if he had any whisky. Deceased said he had not, but that if he and Mr. Black would take Chreitzbergh, go to a certain designated point and wait he would go get some liquor and meet them there in a few minutes, which he did. Deceased also told them if they met Moore and Kendrick to tell them to go to said meeting point, which was at or near Dr. Conger's pasture. Deceased soon met all these parties at the designated place, bringing with him raw alcohol. At appellant's suggestion, deceased and Mr. Black went to a negro's house nearby, who was appellant's tenant, where they divided the alcohol in two bottles, diluted one with water and sugar and returned with both to the crowd. They all, except Chreitzbergh, proceeded to drink the liquor freely, and the evidence justifies the conclusion that they all became more or less affected thereby. After drinking and talking some time, Chreitzbergh and Kendrick got in one of the buggies and left the others.

Soon afterwards trouble arose between appellant and deceased, which resulted in a fight. From the testimony of the State's witnesses, Moore and Black, it was caused by appellant calling deceased a G—d d—s— of a b—. Deceased resented this and struck appellant in the face with his fist. Moore got hold of deceased and Black of appellant and tried to keep them apart and from further fighting. Appellant took the little end of the buggy whip and repeatedly attempted to strike deceased with the butt end of it, but was prevented, and the whip taken from him by Black. He then got an iron pin, or rod, out of his buggy and attempted to strike deceased with that, but was prevented, and

this also taken from him by Black. However, in the melee deceased struck appellant at least twice more in the face with his fist. The licks bruised appellant's face, and one lick broke the skin above the eye and caused blood to flow. More or less talk was indulged in between the parties at the time, appellant telling deceased that he was not able to fight him and had nothing to fight him with. Deceased replied that he could whip him and the whole d— Lake family, repeating this a time or two. Appellant got in his buggy, started off and said: "I will see if you can whip the whole Lake family." Deceased in a friendly manner tried to pacify appellant, but without success.

Appellant alone in his buggy, leaving his friend Black, drove rapidly back to his home at Quitman, about a mile. He there procured his double-barrelled shotgun, put it in his buggy and drove up to his son Elbert's tailor shop for him. He found his son's shop closed and locked and then started directly back to the scene of the fight, where he had left deceased. Elbert, his son, had been out east of his pasture to procure and drive back his milk cow. They met, Elbert on horseback and appellant in his buggy with his shotgun. They stopped and talked some considerable length of time, appellant telling his son why his face was bruised and bleeding, and that deceased caused it. While talking, Sheriff Williams and his deputy, Butler, going east from Quitman, came upon them. They stopped and talked with appellant and his son some time. After the four parleyed some time the sheriff told them he would go and investigate the matter. They all went back together to where the fight occurred.

When they reached the gate leading into Dr. Conger's pasture, the sheriff got down off of his horse, opened the gate, when all the parties, it seems, went in. The sheriff left his horse there unhitched, took the gun out of appellant's buggy and walked up the road, meeting deceased and Chreitzbergh in deceased's buggy, and Kendrick and Moore following behind in another buggy. However, Elbert rode on from the gate, meeting these parties just ahead of the sheriff. When he met Chreitzbergh and deceased, he asked, in substance, who had beaten up his father. They both told him that deceased had. Appellant had already told him this. The sheriff, walking, reached these parties about this time and ordered Chreitzbergh, who had gotten out of the buggy, to throw up his hands and consider himself under arrest. Chreitzbergh immediately complied, and the sheriff searched him, finding no arms upon him. He thereupon ordered deceased out of the buggy and to throw up his hands and consider himself under arrest, which deceased promptly did, and he searched him, finding two pocketknives in his pocket and took both of them off of deceased. He then proceeded back further to the next buggy, where Moore and Kendrick were. He ordered Moore to throw up his hands and consider himself under arrest, with which Moore promptly complied, and he then proceeded to search Moore, finding no arms upon him. Moore inquired why he was arrested and searched. The sheriff responded, because of his being drunk and

fighting. Moore denied that he had had any fight or was drunk. Then a controversy arose between them. The sheriff presented the gun, which he had in his hands, towards Moore as if to shoot him. Deceased and Moore seeing this, evidently believed that the sheriff intended to shoot and kill Moore. Deceased thereupon grabbed the barrel of the shotgun and shoved it so that, if it was discharged, it would not strike Moore. Thereupon, the sheriff pulled his pistol, he said, with the intention of killing deceased. Moore and deceased then grabbed the sheriff's pistol and hand in which he held it, in the struggle holding it in such a way that, if discharged, it would strike neither of them, they declaring at the time that they had no intention of hurting the sheriff, but were seeking to prevent him from killing either of them. While all this struggle was going on, Chreitzbergh succeeded in wrenching the gun from the sheriff, and, when Elbert attempted to interfere, threw the gun down on him and stopped him. In the·meantime, the appellant and the deputy, Butler, had reached the scene and saw and heard most of what occurred at the time. Butler attempted to get the sheriff's pistol; and, when he did, Moore and deceased ceased their struggle for it. Elbert at this time had wrenched the gun from Chreitzbergh, presented it as if to shoot Moore, Chreitzbergh and deceased, and ordered them to scatter, telling them that, if they did not, he would kill all of them. They promptly scattered. Butler appealed to him for God's sake not to shoot. He thereupon lowered the gun. Deceased at once ran to his buggy, jumped in it, put whip to his horses, ran out said gate to the road running north, evidently only intending to avoid being killed. Elbert and his father took after him, Elbert having the shotgun. It is not certain whether Elbert's horse was right there at the time or not, but, if not, Butler's was nearby, and he got on Butler's horse and took after deceased. Appellant also soon reached the horse Elbert had ridden to the scene, mounted him and rapidly followed Elbert after deceased.

Deceased ran up this road a few hundred yards, whipping his horses and seeking to avoid being killed. Elbert soon caught up with the buggy and waved the gun in towards deceased in the buggy. The buggy top and side curtains were up. Elbert was a part of the time alongside deceased's buggy and sometimes behind it, appellant following rapidly on his horse; and he testified that he saw his son and the·buggy of deceased the whole of the time, the collision of the buggies, and the killing.

Mr. Cowan, a wholly disinterested witness, was coming from the west in his no top buggy along the road which intersected the road running north and south, intending to· go this road north. Mr. Wright's place was in the corner of these roads. His house fronted north. Just as Cowan turned from the east and west road into the north and south road, and before his buggy had passed the corner clear, the deceased's buggy and team ran into and broke down his left hind wheel. The collision threw deceased's right horse down, his feet becoming entangled in Cowan's buggy wheel, so that he could not get up, and

deceased's other horse got out from under the trace and reversed his position, both buggies immediately stopping when the crash occurred. Cowan jumped out of his buggy, went back a few paces south and saw and testified to all that occurred thereafter. He said that Elbert jumped off of his horse, ran around to deceased's buggy, and, as deceased was in the act of getting out of his buggy, with one hand hold of the buggy top and the other on the dashboard, or wheel, Elbert with the shotgun in both hands struck deceased therewith an overhand lick on the center of his head, staggering deceased to his knees, and then ran south, deceased ran, following. The lick made a ghastly wound on the head of the deceased, cutting the skin for some inches, from which blood flowed. Both parties ran south some thirty or forty steps, as fast as they could, deceased getting no nearer than about ten steps from. Elbert That after they had run this distance, and were still running, Elbert wheeled and shot deceased in his stomach in the left side, from which he instantly fell and a few hours later died. That deceased in running, following Elbert, had nothing in his hands and was saying nothing and doing nothing except running. Elbert said nothing to deceased after he struck him in the head with the gun.

Mr. Cowan testified: "The next thing that was done, the defendant come running up and said: 'Let me have that gun; let's get that other white faced s— of a b—.'" (Evidently referring to Moore.) That appellant was on his horse and rode up there. That Elbert then went to and got his horse, and they both rode back down south together. "In going from there, defendant passed where the deceased was lying, and he said to him: 'Oh, yes, you white headed s— of a b—, you said you could whip all three of the Lakes. Now, we have got you where we want you.' They then rode on down the lane, going south."

Mrs. Wright testified that she saw the collision and that when Elbert got off his horse, he said: "G— d— you! we have got you now. See whether you can whip all three of the Lakes." At this time she said Elbert was running towards deceased and had the barrel of the gun pointing towards deceased. She was standing in the door of her house and said she then closed the door and did not see the parties again until after the shot was fired, which was soon afterwards. That soon after the shot was fired she looked out of the window and saw deceased on the ground. That she phoned to town; then proceeded to get water and went out to deceased's assistance.

Appellant denied that he went up to the scene of the killing and denied saying what Cowan swore he said. He claimed that he stopped back in the lane near the negro house and saw the race between deceased and his son, the collision with Cowan's buggy and all the other occurrences, including the shooting, and there awaited Elbert; and that, when Elbert reached him, they went back further south, meeting the sheriff, his deputy and Moore, who were some distance back down the lane walking north.

The indictment in the usual allegations, in the first count, charged that the appellant killed the deceased. In the second count, he was

charged as an accomplice in the killing. The second count was abandoned and dismissed, and he was tried only on the first.

The court submitted murder, manslaughter and self-defense. He also charged the law of principals, or attempted to do so, and provoking the difficulty. The court's charge is attacked by appellant on these points on many grounds. It is unnecessary to take them up separately.

The statute is (P. C., art. 74), "all persons are principals who are guilty of acting together in the commission of an offense." And (art. 75) when an offense is actually committed by one, and another is present, knowing the unlawful intent, aids by acts, or encourages by words or gestures, the one actually engaged in the commission of the unlawful act, is a principal. Also (art. 78) any person who advises or agrees to the commission of an offense, and who is present when the same is committed, is a principal thereto, whether he aids or not in the illegal act.

These articles of our Code have been construed and applied many times by the decisions of this court. Where the testimony, positive and circumstantial—one or both, in behalf of the State, as it does in this case, sufficiently raises the question that an accused has conspired with another to kill a person, or knowing his unlawful intent to kill, aids him by acts or encourages him by words or gestures, to kill, he may be convicted as a principal, even though he may not at the time of the killing be bodily in the immediate presence of the actual slayer, it becomes the duty of the trial court to charge and apply the law of principals, and properly submit the issue to the jury for a finding. In the recent cases of Serrato v. State, 74 Texas Crim. Rep., 74, 171 S. W. Rep., 1133; Gonzales v. State, 74 Texas Crim. Rep., 460, 171 S. W. Rep., 1146, and Dillard v. State, 77 Texas Crim. Rep., 1, 177 S. W. Rep., 104, and others, we have reviewed and discussed many of the cases, and charges on this subject, and expressly sustained charges wherein the jury were told under what circumstances an accused would be a principal even though he was not bodily present when the fatal shot was actually fired. We think it altogether unnecessary to again discuss this question herein or review the cases.

The testimony rather forcibly tends to show that appellant may have advised his son Elbert to kill deceased or agreed thereto, and that they conspired to kill him, and acted together in doing so, and that by his acts and conduct he aided and encouraged him in the killing, and thereby became and was, a principal in the killing. What we say herein is not to be taken nor used in another trial that the jury should so find, but merely that the evidence raises these issues, and that they should be properly submitted to the jury for their finding.

We think the testimony of the eyewitnesses to the killing would show, if believed by the jury, that appellant was in such proximity to his son at the time of the killing, as in contemplation of law and in fact, to be actually present at the time, even if his own testimony itself would not so place him. But, as stated above, the testimony would authorize and require the court to submit the question of whether or

not he was a principal, even if it could be claimed he was not bodily present at the exact time and immediate place of the killing, under the circumstances of this case.

It is true article 75, P. C., provides that anyone who keeps watch so as to prevent the interruption of the one committing the offense, and article 76 provides that anyone who procures arms to assist in the commission of an offense, is also a principal; but having carefully studied the testimony herein, we are of the opinion that it raises neither of these issues, and as the court submitted both of them, and authorized the jury to convict appellant, if they believed either, such charge is a material and fatal error to this conviction, and necessarily results in a reversal.

The testimony, positive and circumstantial, was sufficient to show that appellant became angry and entertained malice against deceased, because deceased had struck him in the face with his fist, etc., in the fight. That he deliberately went to his home, got his gun, procured and induced his son to return to the scene of where the fight occurred for the purpose and with the intention of wreaking his vengeance on the deceased to the extent of killing him or having his son do so; and that what was said between him and his son when he met him, and their going back together, and what they both and each did after again getting to deceased, and what he did and said just after his son killed him, was sufficient to raise the issue and require the submission of the question to the jury of whether or not he was a principal.

It is very doubtful if self-defense by appellant's son Elbert was raised by the evidence so as to authorize or require the court to submit that question to the jury. The uncontradicted testimony shows that when the sheriff told deceased he was under arrest, he searched him and found no arms whatever upon him except two pocketknives, and that he then took possession of them and took them from deceased. This was done in the immediate presence of appellant's son Elbert. When deceased fled, it is evident that he did so for the sole purpose of avoiding being killed by Elbert or the sheriff. From that time on until he was killed it was not shown that he attacked Elbert in any way or with anything. The utmost that he did was, because of the unprovoked and brutal act of Elbert in striking him in the head with the shotgun as he was in the act of getting out of his buggy and staggering him to his knees thereby, and then running, to take after him. He is shown positively to have had nothing in his hands or about his person with which he could have inflicted death or any serious injury upon Elbert, and that he got no nearer in the chase than ten steps from him, when he was shot and killed. So that, if the question of self-defense was raised at all, it was Elbert's duty under the law to have resorted to all other means for preventing any injury upon him by deceased before he had the right to shoot and kill him, and the evidence fails to show that he resorted to any other means whatsoever. P. C., art. 1107; Kendall v. State, 8 Texas Crim. App., 569; Freeman v. State, 40 Texas Crim. Rep., 545; Vinson v. State, 55 Texas Crim. Rep., 490; Foster v. State,

11 Texas Crim. App., 105; Jordan v. State, 11 Texas Crim. App., 435; Hunnicutt v. State, 20 Texas Crim. App., 632, and many other cases to the same effect.

The evidence did not raise the issue of provoking the difficulty; even if self-defense was raised, it was error in the court to submit any question of provoking the difficulty.

Appellant's bills to the exclusion of certain testimony and to the questions asked by the district attorney as presented by his bills show no error. It is unnecessary to state or discuss them.

For the error of the court in submitting to the jury that they might find appellant guilty if he kept watch or furnished the gun to Elbert with which the killing was done, and provoking the difficulty, if self-defense was raised, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*